**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| **INDIANA GREEN PARTY, et al.,** ) | **Case No. 1:22-cv-00518-JRS-KMB** |
| ) | |
| Plaintiffs, ) | **Judge James R. Sweeney II** |
| v. ) | |
| ) | **Magistrate Judge Kellie M. Barr** |
| **DIEGO MORALES, in his official capacity as** ) | |
| **Secretary of State for the State of Indiana,** ) | |
| ) | |
| Defendant. ) | |

**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**
**MEMORANDUM IN SUPPORT**

## I. INTRODUCTION

Since the year 2000 no new party or independent candidate for statewide office has

qualified for Indiana's general election ballot.

Under Indiana law, such candidates qualify only if: (1) they submit nomination petitions

signed by eligible voters equal in number to 2 percent of the total vote for Secretary of State in

the prior election, *see* I.C. 3-8-6-3 (the "Signature Requirement"); and (2) the voters sign the

paper petitions in person, by hand, on a petition form separated by the voters' county of

residence, and the petitions are timely submitted to the appropriate county board of election, of

which there are 92, *see* I.C. 3-8-6-6, 3-8-6-10(a) (the "Petitioning Procedure"), on or before June

30 of the election year in which the candidates run. *See* I.C. 3-8-6-10(b) (the "Filing Deadline").

A new party that successfully qualifies may retain that qualification only if it runs a candidate for

Secretary of State who qualifies for the ballot and then receives at least 2 percent of the total

votes cast in that race. *See* I.C. 3-8-4-1 (the "Vote Test"). Indiana does not provide *any*

1

procedure by which independent candidates can retain ballot access; even an incumbent independent who wins election to office still must petition for ballot access in the next election.

In 2022, the Signature Requirement translated to 44,935 valid signatures, and in 2024 it translates to 36,943 valid signatures. The ostensible purpose of the Signature Requirement is to ensure that candidates demonstrate a "modicum of support" as a condition of their inclusion on Indiana's ballot. *See Jenness v. Fortson*, 403 U.S. 431, 442 (1971). In this case, the uncontested evidence demonstrates that Indiana has never had an overcrowded ballot nor any significant instances of voter "confusion" or "deception" as a result of a candidate's qualification for the ballot. Nevertheless, after several incremental increases over the years, in 1980 Indiana quadrupled both the Signature Requirement and the Vote Test, from 0.5 percent of the total vote for Secretary of State to 2 percent of that vote.

Affirmative – and uncontested – evidence indicates that Indiana quadrupled the signature requirement effective 1984, not to protect any compelling state interest, but simply to engage in score settling based on occurrences in a local mayoral election. The predictable result, however, is that new party and independent candidates have been excluded from Indiana's electoral process. Not only has no such candidate for statewide office qualified for Indiana's general election ballot in 23 years and counting, but also, the few that qualified before that had to spend inordinate sums of money to do it.

Major parties in Indiana – the Republicans and Democrats – face no such difficulties. Major parties select their nominees by means of taxpayer-funded primary elections. Once the nominees are selected, they appear on Indiana's general election ballot automatically. Neither the major party candidates nor the parties themselves incur any expense in connection with the candidates' placement on the general election ballot.

Shortly after Indiana's quadrupled Signature Requirement took effect in 1984, several

voters, candidates, and a minor political party filed a lawsuit to challenge its constitutionality. *See Hall v. Simcox*, 766 F.2d 1171 (7th Cir. 1985) (Posner, J.). Although the 7th Circuit upheld the Signature Requirement, Judge Posner observed that "Indiana would be in trouble" if heightened scrutiny applied because the state had not asserted any interest to justify its decision to quadruple the requirement. *See id.* at 1173. Judge Posner suggested, based on the failure of any candidate to comply with the new requirement in 1984, that it "will eliminate all minor parties from the presidential ballot," such that "the ballot as a method of expressing political views may be completely closed to minor parties in Indiana." *Id.* (citing *Jenness*, 403 U.S. at 438. "[O]nly time will tell," Judge Posner noted.

Time has now told. No new partisan or independent candidate has completed a successful statewide petition drive in 23 years and counting. As predicted, Indiana's ballot is, for practical purposes, "completely closed" to these candidates and the voters who support them. *Hall*, 766 F.2d 1173.

In this case Plaintiffs present the constitutional challenge that Judge Posner apparently anticipated in *Hall*. Since that case was decided, the Supreme Court and Seventh Circuit have made clear that a more exacting standard applies, pursuant to which a state must assert interests that are sufficient weighty to justify its restrictions on ballot access. *See Gill v. Scholz*, 962 F.3d 360, 364-65 (citing *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 190 (2008)). Here, not only does the record demonstrate that no state interest justifies the burden imposed by the Challenged Provisions, but also, unlike *Hall*, it includes affirmative, uncontroverted evidence that Indiana's quadrupled Signature Requirement and Vote Test were never intended to further any such interest. The record here, unlike *Hall*, unequivocally establishes that the Challenged Provisions "operate to freeze the political status quo." *Jenness*, 403 U.S. at 438.

For the reasons stated above, and those specified below, Plaintiffs here should prevail

where the plaintiffs in *Hall* did not.

## II.   STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

### A.   SEVERE AND UNEQUAL BURDENS IMPOSED BY THE CHALLENGED STATUTES

#### 1.   The Burdens Are Severe

1.        No Minor Party or Independent candidate has completed a successful statewide

Nomination Petition drive in Indiana since 2000.

> **Admitted:** Defendant's Objections And Supplemental Responses
> To Plaintiff's [sic] First Request For Admissions, response to
> REQUEST NO. 1, ECF No. 55-1 at 17-18; **and** Rule 30(b)(6) King
> Dep. Tr. 63:14-64:2, ECF No. 51-5 at 17.

2.        The only statewide candidates who have appeared on the Ballot since 2000 have

been candidates of the Democratic Party, the Republican Party, or the Libertarian Party.

> **Admitted:**  response to Request for Admission No. 5, ECF No. 55-
> 1 at 20 **and** King Dep. Tr. 63:14-64:2, ECF No. 51-5 at 17.

3.        Only eight successful statewide Nomination Petition drives have been completed

in Indiana by Minor Party or Independent candidates since 1984.

> **Admitted:** response to Request for Admission No. 2, ECF No. 55-
> 1 at 19.

4.        A Minor Party or Independent candidate who qualifies for the Ballot by

Nomination Petition in a Presidential election year will not be able to retain that qualification for

the next election cycle.

> **Admitted:** response to Request for Admission No. 3, ECF No. 55-
> 1 at 20 **and** King Dep. Tr. 38:15-39:3, ECF No. 51-5 at 11.

5.        Indiana provides no procedure whereby an Independent candidate can ever retain

ballot qualification in Indiana.

> **Admitted:** response to Request for Admission No. 4, ECF No. 55-
> 1 at 21 **and** King Dep. Tr. 46:1-20, ECF No. 51-5 at 13.

6.        The last candidate to succeed in a statewide nomination petition drive in Indiana was Pat Buchanan, running as an independent candidate for President in 2000.

>   Declaration of Angela Marie "Bay" Buchanan, Exhibit 2,  ECF
>   No. 60-3 at 1, ¶ 3.

7.        The cost of Mr. Buchanan's 2000 nomination petition drive was more than $350,000. Mr. Buchanan's campaign could not have afforded the cost of the Indiana petition drive were it not assured of millions of dollars in federal matching funds.

>   *Id*. at 4, ¶ 13.

8.        The Green Party Presidential candidate, Ralph Nader, attempted a statewide nomination petition drive in Indiana in 2000 but failed.

>   Declaration of Jason Kafoury, Exhibit 5, ECF No. 60-6 at 4, ¶ 15.

9.        The campaign of the Green Party Presidential nominee in 2016, Jill Stein, determined that it could not mount a petition drive in Indiana because the cost of complying with the Indiana nomination petition requirements was prohibitive.

>   Declaration of Jill Stein, Exhibit 11, ECF No. 60-12 at 1, ¶ 4.

10.        The campaign of the Green Party Presidential nominee in 2020, Howie Hawkins, determined that it could not mount a petition drive in Indiana because the cost of complying with the Indiana nomination petition requirements was prohibitive.

>   Declaration of Howie Hawkins., Exhibit 4, ECF No. 60-5 at 2, ¶ 7.

11.        Two petitioning firms provided proposals to the Green Party for a statewide nomination petition drive for the 2022 election cycle. The cost estimates were $465,345 (First Choice Contracting) and $565,750 (Accelevate 2020).

>   Declaration of David Wetterer, Exhibit 14, ECF No. 60-15 at 1-2,
>   ¶¶ 5-6 and Exhibits A and B to the Declaration..

12.	Although the Libertarian Party has retained its ballot-qualified status since 1994, the imperative that the Party must meet the 2-percent vote test in every race for Secretary of State to do so distorts its political priorities, its fund  raising and budgetary priorities and its electoral strategy. It hinders its ability to grow and develop as a party and restricts its ability to promote its platform and build support among the electorate.

> Declaration of Evan McMahon, Exhibit 6, ECF No. 60-7 at 3-7,
> ¶¶ 13, 15-29.

13.	If the Libertarian Party loses its status as a ballot-qualified party, the Party will likely be unable to execute a successful nomination petition drive to re-qualify.

> *Id*. at 7-8, ¶¶ 31-33.

14.	Volunteer petition drives cannot succeed when states require as many signatures as Indiana's current Signature Requirement."

> Declaration of William Redpath, Exhibit 9,  ECF No. 60-10 at 3-5,
> ¶¶ 8-13.

### 2.	The Burdens Are Unequal

15.	Indiana taxpayer funds are used to pay for supplies and equipment used in major party primaries, with funds raised through local property taxes and funds appropriated by the General Assembly.

> **Admitted:** response to REQUEST FOR ADMISSION NO. 7, ECF
> No. 55-1 at 22 **and** King Dep. Tr. 15:1-8, ECF No. 51-5 at 5.

16.	In the 2020 election cycle, public funds totaling $14,676,849.66 were expended by Indiana to support the Democratic and Republican primaries.

> Defendant's Third Supplemental Response to Plaintiffs' First Set
> of Interrogatories, response to INTERROGATORY NO. 7, ECF
> No. 55-1 at 12-13 **and**  Declaration of William P. Tedards, Jr,
> Exhibit 17, ECF No. 60-18.

17.	Major Party candidates appear on the ballot automatically once they are

nominated in taxpayer-funded primaries, and neither the candidates nor the Major Parties need expend any funds or resources to ensure their ballot placement.

> I.C. 3-10-1-2, 3-11-6-1, 3-11-6-9, and 3-11-6.5-2.

18. Indiana does not provide public funding to pay for any costs associated with a Minor Party or Independent candidate's efforts to comply with Indiana's Nomination Petition procedures.

> **Admitted:** response to REQUEST FOR ADMISSION NO. 10, ECF No. 51-5 at 23 **and** King Dep. Tr. 35:16-36:2, 37:2-6, ECF No. 51-5 at 10.

## B. THE SECRETARY'S PROFFERED STATE INTERESTS DO NOT JUSTIFY THE BURDENS IMPOSED

### 1. The Indiana Legislature Did Not Consider State Interests When It Quadrupled The Signature Requirement In 1980

19. In 1980, legislation was introduced to quadruple Indiana's ballot access requirements for independent and minor party candidates. At the time, to qualify for the ballot Indiana required such candidates to submit nomination petitions signed by eligible voters equal in number to 0.5 percent of the vote cast for Secretary of State in their districts in the preceding election for that office. Minor party candidates for Secretary of State could qualify their party to retain ballot access if they received votes equal in number to 0.5 percent of the vote cast for that office. The legislation would increase both requirements to 2 percent of the votes cast for Secretary of State.

> Declaration of Mitchell V. Harper, Exhibit 3, ECF No. 60-4 at 2, ¶¶ 9-10.

20. The legislation was introduced as House Bill 1159 by State Representative Richard Bell, a Democrat.

> *Id*. ¶ 11 and Exhibit A to the Declaration.

21.         The bill was enacted virtually without debate, to settle scores, based on occurrences in a local mayoral election.

>    *Id*. at 2-5,  ¶¶ 12-23, 26, 29 and Exhibits B-C to the Declaration.

22.         No Representative mentioned a regulatory interest that the legislation was intended to protect or identified any reason why it should apply to statewide, congressional and legislative races.

>    *Id*. ¶¶ 23, 29.

23.         The Secretary of State "had no role in the passage of [this] statute, and has no direct knowledge of the intention behind [its] passage."

>    The Defendant's Third Supplemental Response To Plaintiff's First Set Of Interrogatories, INTERROGATORY NO. 1 and Answer, ECF No. 55-1 at 3.

## 2.    Much Lower Signature Requirements Will Protect The State's Interest In Avoiding Ballot Overcrowding

24.         In the history of American elections, no state which has imposed a requirement of more than 5000 signatures on independent or minor party candidates for President has ever had more than eight candidates on the general election ballot, with the exception of New York, which had nine in 1980 and nine in 1996.

>    Declaration of Richard Winger, Exhibit 15, ECF No. 60-16 at 2-3, ¶ 6 and Exhibit B to the Declaration generally.

25.         In the history of American elections, no state which has imposed a requirement of more than 5000 signatures on independent or minor party candidates for Governor or Senator has ever had more than eight candidates on the general election ballot, except for New York, which had ten candidates for Governor in 1998.

>    *Id*. at 3, ¶ 7.

26.         States frequently accommodate more than eight candidates on their Presidential

primary ballots. In 2016, the Republican Party's Presidential primary ballot included more than ten candidates in twenty-one states.

>   *Id*. at 3-4, ¶ 8.

27.     In 2020, the Democratic Party's Presidential primary ballot included more than ten candidates in nine states.

>   *Id*. at 4, ¶ 9.

28.     Over the twelve Presidential election cycles that Indiana's 0.5 percent signature requirement was in effect (1936 through 1980), the signature requirements fluctuated between 6,642 and 8,863, and the number of candidates that appeared on Indiana's general election ballot fluctuated between four and six, with one exception in 1980 when there were seven.

>   *Id*. and Exhibit B to the Declaration at 3-4.

29.     Over the last five Presidential election cycles (2004-2020), the number of candidates that have appeared on Indiana's general election ballot has been frozen at three.

>   *Id*.

30.     When measured as a percentage of the total vote for President in 2020, Indiana's 2024 signature requirement for independent and minor party Presidential candidates is higher than all other states, except California and Wyoming.

>   *Id*. at 5, ¶ 13 and Exhibit C to the Declaration, at 2.

### 3.     Indiana's Early Filing Deadline Is Unnecessary

31.     Indiana's current June 30 filing deadline is much earlier than Indiana's filing deadline was for most of the State's history.

>   *Id*. at 5, ¶ 14.

32.     Indiana's June 30 filing deadline is earlier than the deadline in all but six other states.

*Id* at 6, ¶ 15 and Exhibit D to the Declaration.

33.     In 2018, sixteen states and D.C. had August or September filing deadlines for statewide independent candidates, with no problems reported.

*Id*. ¶ 16 and Exhibit D to the Declaration.

**4.     Other States Are Easing Their Ballot Access Requirements**

34.     Indiana is one of only four states in which Presidential candidate Ralph Nader, who placed third in the 2000, 2004, and 2008 Presidential elections, never qualified for the ballot.

*Id*. ¶ 17 and Kafoury Decl., ECF No. 60-6 at 2, ¶¶ 5-6.

35.     The other three states in which Ralph Nader never qualified for the ballot, Georgia, North Carolina, and Oklahoma, have all eased their Presidential ballot access requirements since he last ran.

*Id*. at 6-7, ¶ 18.

## III.     FACTUAL BACKGROUND

### A.     Indiana Ballot Access History

Indiana did not regulate access to its ballot until 1889. (Complaint, ECF No. 1 ("Compl.") at 7, ¶ 18.) Its original ballot access law enacted that year allowed any candidate for statewide office to qualify by submitting nomination petitions with only 500 signatures just 20 days before the general election. (*Id.*) In 1907, Indiana began to require parties that polled more than 10 percent of the vote for Secretary of State in the last election to nominate by primary election. (*Id.* ¶ 19.)

In 1933, Indiana increased its signature requirement for parties that did not nominate by primary election to 0.5 percent of the total vote for Secretary of State in the previous election. (*Id.* ¶ 20.) The same legislation provided that a party could retain ballot access if its candidate for

Secretary of State received 0.5 percent of the total vote in that election. (*Id.*) Indiana's signature requirement and vote test for a party to retain ballot access remained unchanged from 1933 until 1980. (*Id.* at 8, ¶ 23.) In the 12 presidential election cycles that occurred during that time, Indiana's signature requirement fluctuated between 6,642 and 8,863, and there were never more than six candidates on the ballot, except that in 1980 there were seven. (Statement of Material Facts Not in Dispute ("SMF"), *supra* at 4-10, 28.)

In 1980, Indiana quadrupled both its signature requirement and vote test, from 0.5 percent of the total vote for Secretary of State in the previous election to 2.0 percent of that total vote. (SMF #19-21.) The quadrupled requirements took effect in 1984 (the Signature Requirement) and 1986 (the Vote Test) and remain in effect today. *See* IC 3-8-6-3; IC 3-8-4-1. Indiana has never adopted a Vote Test for independent candidates. Indiana law therefore does not provide independent candidates with any method for retaining ballot access, no matter how many votes they receive in an election. (SMF #5.)

Indiana did not enact its current Filing Deadline of June 30 until 2001. (Compl. at 8, ¶ 24.) Prior to that, from 1947 to 1986, the filing deadline was September 1, and from 1986 to 2001 it was in July or August. (*Id.* ¶¶ 21, 24.)

## B.   Brief Overview of the Indiana Election Code[1]

Indiana has established separate procedural pathways for candidates to qualify for the general election ballot. (*Id.* at 9, ¶ 25). Major Parties – those that poll at least 10 percent of the vote for Secretary of State in the previous election – nominate their candidates for federal, state, legislative and local office by primary election. IC 3-10-1-2; I.C. 3-8-2-2. Candidates who seek to run in a Major Party's primary for Governor or U.S. Senator qualify by submitting nomination

---

[1] A comprehensive summary of Indiana Election Code provisions governing ballot access for Major Parties, Minor Parties, unqualified new parties and independent candidates is set forth in the Complaint at ¶¶ 25-51, and is incorporated herein by reference.

petitions signed by at least 4,500 voters of the state, including at least 500 voters from each congressional district. IC 3-8-2-8. The petitions must be submitted to county voter registration offices 91 days before the primary election. IC 3-8-2-10(a).

Primary elections are paid for using taxpayer funds raised through local property taxes and allocated by the general assembly. IC 3-11-6-1; IC 3-11-6-9; IC 3-11-6.5-2. County elections boards prepare the primary election returns showing the number of votes received by each party's candidates in the primary election, and the circuit court clerks must transmit the returns to the elections division via the computerized statewide voter registration list established by the state. IC 3-10-1-33; see IC 3-7-26.3 (establishing computerized statewide voter registration list). The elections division canvasses the votes and tabulates the results. IC 3-10-1-34. The candidate of a political party receiving the highest vote total for each office is the party's nominee for that office and is automatically placed on the general election ballot. IC 3-8-7-1; IC 3-8-7-25(1).

Major Parties also select their presidential nominees in taxpayer-funded primary elections. IC 3-8-3-1. The primary election returns are tabulated by circuit court clerks and transmitted using the state's computerized voter registration lists. IC 3-8-3-9. The elections division certifies the results to the Chair of each Major Party. IC 3-8-3-10. The delegates thereby selected must support the winner of the primary election at the party's national convention. IC 3-8-3-11.

Candidates of a party that is not already ballot-qualified and independent candidates become qualified by filing nomination petitions. IC 3-8-6-1. The petitions must be signed by qualified, eligible voters, see IC 3-8-6-2; IC 3-8-6-6, equal in number to 2 percent of the total vote cast at the last election for secretary of state in the election district that the candidate seeks to represent. IC 3-8-6-3. Each voter must sign a candidate's nomination petition by hand, including the voter's signature, legibly printed name and residence address. IC 3-8-6-6. The

petitions must be separated by the voters' county of residence and must be submitted to the appropriate county voter registration office by noon on June 30 of the election year. IC 3-8-6-10(a),(b). If the petitions are deemed to include the required number of valid signatures, the candidate is certified for inclusion on the general election ballot. IC 3-8-6-3; IC 3-8-6-12(d)(1); IC 3-8-6-12(d)(2).

An unqualified party can become a ballot-qualified Minor Party only if its nominee for Secretary of State received at least 2 percent of the total vote cast for that office in the last election. IC 3-8-4-1. A Minor Party that complies with IC 3-8-4-1 is entitled to hold a state convention to nominate its candidates for Lieutenant Governor, Secretary of State, Auditor of State, Treasurer of State, Attorney General and, if it elects to do so, presidential electors and alternate presidential electors and delegates and alternate delegates to the party's national convention. IC 3-8-4-2. No taxpayer funding is used to pay for any costs associated with an independent candidate's, an unqualified party's or a Minor Party's efforts to comply with the foregoing provisions.

## IV.   PROCEDURAL HISTORY

Plaintiffs commenced this action on March 17, 2022. Plaintiffs' Complaint asserts two claims against Defendant Secretary of State Diego Morales ("the Secretary") in his official capacity. Count I asserts that the Challenged Provisions, as applied separately and in combination, violate Plaintiffs' First and Fourteenth Amendment Rights. (Compl. ¶¶ 94-97). Count II asserts that the Challenged Provisions, as applied separately and in combination, violate Plaintiffs' rights guaranteed under the Equal Protection Clause. (Compl. ¶¶ 98-99.) Plaintiffs respectfully request that the Court declare the Challenged Provisions unconstitutional as applied separately and in combination, (Compl. ¶ 100.A), enjoin the Secretary from enforcing the Challenged Provisions against Plaintiffs, (Compl. ¶ 100.B), and grant further relief as

appropriate. (Compl. ¶ 100.C-E.)

On May 18, 2022, the Secretary filed a motion to dismiss pursuant to Fed R. Civ. P. 12(b)(6). (ECF No. 17.) The Court denied that motion in an order entered on October 28, 2022. (ECF No. 35.) The parties proceeded to take discovery. Following the completion thereof, Plaintiffs proceeded to prepare the instant Motion for Summary Judgment.

## V.  LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To prevail, the movant must present sufficient evidence to convince the trier of fact to accept its version of the events. *See Gekas v. Vasilades*, 814 F.3d 890, 896 (7th Cir. 2016). The movant is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *See Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). To survive a motion for summary judgment, the non-moving party must set forth specific, admissible evidence showing that there is a material issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *See Skiba v. Illinois Cent. R.R. Co.,* 884 F.3d 708, 717 (7th Cir. 2018). However, if the non-moving party fails to properly support a fact in opposition to the movant's factual assertion, the Court may consider that fact undisputed and rely on it to grant summary judgment for the movant. *See Davis v. U.S.*, 400 F. Supp. 3d 745, 747 (S.D. Ind. 2019) (citing Fed. R. Civ. P. 56(e); Local Rule 56-1(e) (citations to supporting facts required)).

## VI.  ARGUMENT

### A.  The Court Should Subject the Challenged Provisions to Heightened Scrutiny Under the *Anderson-Burdick* Analysis.

Nearly 45 years ago, the Supreme Court made clear that ballot access cases cannot be decided by applying a "litmus-paper test" that neatly separates unconstitutional statutory schemes from those that pass muster. *Storer v. Brown*, 415 U.S. 724, 730 (1974). Decisions in such cases are instead "a matter of degree" and require careful consideration of "the facts and circumstances behind the law…" *Id.* at 730 (citations omitted). The "inevitable question for judgment" is whether "a reasonably diligent … candidate [can] be expected to satisfy" the challenged requirements, and the answer to that question requires an examination of "past experience" to determine whether candidates have in fact complied: "it will be one thing if independent candidates have qualified with some regularity and quite a different matter if they have not." *Id.* at 742.

Since *Storer* was decided, the Court has established an analytic framework that governs constitutional review of ballot access cases. Under that framework, a reviewing court:

> must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests, it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights. Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional.

*Anderson*, 460 U.S. at 789. This framework establishes a "flexible standard," according to which "the rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged restriction burdens First and Fourteenth Amendment rights." *Burdick v. Takushi*, 504 U.S. 428, 434 (1992). Under this standard, "reasonable, nondiscriminatory restrictions" are subject to less exacting review, whereas laws that impose "severe" burdens are subject to strict scrutiny. *See id.* (citations omitted). But in every case, "However slight [the] burden may appear ... it must be justified by relevant and legitimate state interests sufficiently

weighty to justify the limitation." *Crawford*, 553 U.S. at 191 (citation and quotation marks omitted).

Lower courts, including the Seventh Circuit, have duly followed what has come to be known as the *Anderson-Burdick* analysis, with its careful focus on the "character and magnitude" of the plaintiff's alleged injury, as balanced against the "precise interests" the state asserts to justify the challenged regulations, the "legitimacy and strength of each of those interests," and the extent to which they "make it necessary" to burden plaintiff's constitutional rights. *Anderson*, 460 U.S. at 789; *see also Gill*, 962 F.3d at 364-66. "Much of the action takes place at the first stage of *Anderson's* balancing inquiry," the Seventh Circuit has observed, because the severity of the burden imposed is what determines whether strict scrutiny or a less demanding level of review applies. *Stone v. Board of Election Com'rs for City of Chicago*, 750 F.3d 678, 681 (7th Cir. 2014) (citing *Burdick*, 504 U.S. at 534). Even so, the *Anderson-Burdick* analysis "can only take us so far," because "there is no litmus test for measuring the severity of a burden that a state law imposes, either." *Id.* (citation and quotation marks omitted).

The Supreme Court has nevertheless established standards that lower courts follow to identify severe burdens. The Seventh Circuit, for example, has relied on the "past experience" test in *Storer* to conclude that Illinois' signature requirement imposed a severe burden based on the absence of unaffiliated candidates from the ballot for a period of 25 years. *See Lee v. Keith*, 463 F.3d 763, 769-70 (7th Cir. 2006). The Seventh Circuit has also recognized that ballot access laws impose severe burdens if they "freeze the political status quo." *See Stone*, 750 F.3d at 684-85 (quoting *Jenness*, 403 U.S. at 438). And in *Anderson*, the Supreme Court observed that ballot access restrictions may be severe if they "limit[] political participation by an identifiable political group whose members share a particular viewpoint, associational preference, or economic status." *Anderson*, 460 U.S. at 793 (footnote omitted).

In this case, Plaintiffs present a comprehensive evidentiary record to establish that the Challenged Provisions are severely burdensome under the "past experience" test in *Storer*, under the "frozen political status quo" test in *Jenness*, and under the "viewpoint, associational preference, or economic status test" in *Anderson*. As set forth below, Plaintiffs' evidence demonstrates that the Challenged Provisions have totally excluded new partisan and independent candidates for a period commensurate with that in *Lee*, thus meeting the *Storer* past experience test. It further demonstrates that Indiana's political status quo is frozen, thus meeting the *Jenness* test. And it demonstrates that the Challenged Provisions limits candidates' participation based upon their associational preference and economic status, thus meeting the *Anderson* test. The Court should therefore apply heightened scrutiny under the *Anderson-Burdick* analysis.

**B.    The Challenged Provisions Impose Severe and Unequal Burdens on Plaintiffs' Fundamental Rights.**

Under the first step in the *Anderson-Burdick* analysis, the Court must consider the "character and magnitude" of the burdens that the Challenged Provisions impose. *Anderson*, 460 U.S. at 789. Here, the Challenged Provisions implicate Plaintiffs' fundamental rights. The burdens they impose on those rights are also severe under the standards recognized in *Storer*, *Jenness* and *Anderson*.

**1.    The Challenged Provisions Implicate Plaintiffs' Fundamental Rights.**

The Challenged Provisions injure Plaintiffs in three distinct but related ways: as voters who are denied the opportunity to associate with and cast their votes effectively for the candidates whom they support; as candidates who are denied the opportunity to run for public office; and as political parties that cannot pursue their chosen strategies to grow and build support among Indiana's electorate. These injuries implicate Plaintiffs' fundamental rights.

The Supreme Court has recognized that state laws restricting ballot access burden "two

different, although overlapping, kinds of rights – the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively." *Williams v. Rhodes*, 393 U.S. 23, 30 (1968). "Both of these rights rank among our most precious freedoms." *Id.* Furthermore, "the right to vote is heavily burdened if that vote may be cast only for one of two parties at a time when other parties are clamoring for a place on the ballot." *Id.* at 31.

The Court has not attached the same "fundamental status" to the rights of candidates, but it has recognized that candidates' rights and voters' rights "do not lend themselves to neat separation," because "laws that affect candidates always have at least some theoretical, correlative effect on voters." *Bullock v. Carter*, 405 U.S. 134, 143 (1972). Of particular concern are laws "tending to limit the field of candidates from which voters might choose." *Id.* As the Court explained in *Anderson*, "the exclusion of candidates … burdens voters' freedom of association, because … a candidate serves as a rallying point for like-minded citizens." *Anderson*, 460 U.S. at 787-788.

Finally, the Court has recognized "the constitutional right of citizens to create and develop new political parties." *Norman v. Reed*, 502 U.S. 279, 288 (1992). This right "derives from the First and Fourteenth Amendments, and advances the constitutional interest of likeminded voters to gather in pursuit of common political ends." *Id.* It is "an integral part of [the] basic constitutional freedom" to associate for the "advancement of political beliefs and ideas." *Kusper v. Pontikes*, 414 U.S. 51, 57 (1973). Furthermore, "[t]he right to form a party for the advancement of political goals means little if a party can be kept off the election ballot and thus denied an equal opportunity to win votes"). *Williams*, 393 U.S. at 31.

### 2.    The Challenged Provisions Impose Severe Burdens.

In *Lee*, the Seventh Circuit measured the severity of the burden imposed by Illinois's

ballot access laws "by comparison to the ballot access requirements in the other 49 states [and] by the stifling affect they have had on independent [and new partisan] candidacies since their inception…." *Lee*, 463 F.3d at 768. Like the provisions struck down in *Lee*, the Challenged Provisions here "fall[] on the 'severe' end of the sliding scale" under both metrics.

Indiana's Signature Requirement, as applied to candidates for statewide office in 2024, translates to 36,943 valid signatures. *See* I.C. 3-8-6-3. That figure is substantially lower than it has been in recent years. In 2022, for example, the Signature Requirement was 44,935 valid signatures. (Compl. ¶ 68.) But even the lower 2024 Signature Requirement places Indiana's ballot access requirements among the most restrictive in the nation: as applied to presidential candidates, only three states impose a higher requirement – California, Texas and New York – and they, unlike Indiana, are three of the four most populous states in the nation. *See* Winger Decl., Ex. C. Further, when measured as a percentage of the total vote in the 2020 presidential election, Indiana's 2024 Signature Requirement is higher than every other state's except California and Wyoming. *See* Winger Decl. ¶ 13. The Signature Requirement, when measured in comparison with those of other states, falls on the severe end of the scale. *See Lee*, 463 F.3d at 768.

The Signature Requirement is also severe due to its "stifling effect" on new partisan and independent candidacies. It is uncontested that no such candidate has complied with the Signature Requirement in 23 years and counting. (SMF #1.) That is "powerful evidence" that the burden it imposes is severe. *Cf. Stone*, 750 F.3d at 683 (finding nine candidates' compliance with a signature requirement in a single election "powerful evidence" that the burden imposed was not severe). As the Seventh Circuit has explained, "[w]hat is ultimately important is not the absolute or relative number of signatures required but whether a reasonably diligent candidate could be expected to be able to meet the requirements and gain a place on the ballot." *Id.* at 682 (citation

and quotation marks omitted). When the Seventh Circuit struck down the provisions challenged in *Lee*, for example, it emphasized "the importance of the historical record to the constitutional equation," and thus relied heavily on the "complete exclusion" of independent candidates from Illinois' ballot in the preceding 25 years to support its finding of a severe burden. *Lee*, 463 F.3d at 770. Here, the uncontested facts establish the complete exclusion of new partisan and independent candidates from Indiana's statewide ballot for the last 23 years – a nearly identical length of time. (SMF #1). As in *Lee*, therefore, the historical record in this case establishes that the Signature Requirement imposes a severe burden under the *Storer* "past experience" test. *See Lee*, 463 F.3d at 769-70 (citing *Storer*, 415 U.S. at 742).

When this Court denied the Secretary's Motion to Dismiss, it properly recognized that courts "are required to evaluate challenged ballot access restrictions together, not individually, and assess their combined effect on voters' and candidates' political association rights." *Lee*, 463 F.3d at 770 (citing *Nader v. Keith*, 385 F.3d 729, 735 (7th Cir. 2004)); *see* MTD Order at 4 (citing *Lee*). Here, Indiana's early Filing Deadline compounds the already-severe burden imposed by the Signature Requirement. The June 30 Filing Deadline is earlier than that of all but six other states, and it is more than a month earlier than the median deadline for all 50 states. (SMF #32); *see* Winger Decl. ¶ 15. The Filing Deadline, although not the earliest in the nation, is nonetheless on the severe end of the scale when measured in comparison with other states. *See Lee*, 463 F.3d at 768.

The uncontroverted evidence in the record supports the common-sense conclusion that Indiana's early Filing Deadline makes its high Signature Requirement even more difficult to meet. The last statewide candidate to qualify for Indiana's ballot by petition, presidential independent Patrick Buchanan in 2000, was under extreme time pressure to comply with the Filing Deadline, even though at that time it was July 15 – a full two weeks later than it is now.

*See* Buchanan Decl. ¶¶ 5-11. As a result, Buchanan had to dedicate his entire campaign apparatus and resources to the effort until it was complete, which prevented him from dedicating time and resources to ballot access efforts in other states or even to his actual campaign for election. *See id.*; *see also id.* at ¶¶ 14, 16-18. Indiana's early Filing Deadline placed similar constraints on the last statewide candidate to qualify before Buchanan – the Reform Party's 1996 presidential nominee Ross Perot – notwithstanding the virtually unlimited resources available to his campaign as a self-financed billionaire. *See* Verney Decl. ¶¶ 9-10, 19-20.

The heavy burdens imposed by the Signature Requirement and Filing Deadline are exacerbated by Indiana's 134-year-old Petitioning Procedure. *See* I.C. 3-8-6-6, 3-8-6-10(a). As in 1889, when Indiana first started regulating access to the ballot, new partisan and independent candidates must obtain voters' signatures in person, by hand, on paper nomination petitions, which must be separated by voters' county of residence and submitted to 92 different county boards of election. *See id*. That procedure may have been adequate as a means of demonstrating the requisite modicum of support in 1889, when Indiana's statewide signature requirement amounted to only 500 signatures, but it is grossly inadequate to the task in Indiana's recent election cycles, when the Signature Requirement has translated to approximately 35,000-45,000 signatures.

When petition circulators obtain a voter's signature, they have no way to verify that the voter is eligible to sign the petition and that the signature is valid. As a result, a substantial percentage of the total signatures that petitioners obtain are invalidated due to technical defects such as incorrect or omitted information, information signed on the wrong line, mismatches between a voter's current and registered addresses, or simply because a voter's handwriting is illegible. *See* Muehlhausen Decl. ¶ 14. To ensure compliance with the Signature Requirement, therefore, it is generally necessary to exceed it by at least 50 percent. *See* Kafoury Decl. ¶ 8;

Buchanan Decl. ¶ 4. In effect, the inadequacy of the Petitioning Procedure increases the Signature Requirement – which is already severe standing alone – by half as much again.

Moreover, under the best of circumstances, collecting signatures by hand is inherently time-consuming, labor-intensive and expensive. *See* Muehlhausen Decl. ¶ 14; Kafoury Decl. ¶¶ 9-10. Voters are often unwilling to stop in public and provide their signatures and personal information to an unknown petition circulator, even if they support a candidate's right to participate in an election. *See* Muehlhausen Decl. ¶ 15. Other potential signers may be confrontational, threatening or abusive. *See* Kafoury Decl. ¶ 10. Additionally, political adversaries or unscrupulous petition circulators can sabotage paper nomination petitions by deliberately signing ineligible or fraudulent names. *See* Kafoury Decl. ¶ 17. Local officials and property owners also frequently force petition circulators to relocate, losing valuable time in the process, even when they are engaged in First Amendment protected conduct. *See* Tucker Decl. ¶ 10. All of this makes petitioning a physically challenging and mentally taxing activity that few people are capable of doing successfully. *See* Kafoury Decl. ¶¶ 9-10 . Furthermore, those who have disabilities, such as Plaintiff Brand, who is legally blind, or those who require the use of a wheelchair, are at an extreme disadvantage – if they are able to petition at all. *See* Brand Decl. ¶ 14; Wolfe Decl. ¶ 14.

Petitioning is especially difficult in Indiana due to its unusual requirement that petitions be separated by voters' county of residence and submitted to 92 different county boards of voter registration. *See* Buchanan Decl. ¶¶ 5-7; Verney Decl. ¶ 13; Kafoury Decl. ¶ 11. This dramatically increases the burden of petitioning in Indiana as compared to the great majority of states that impose no such requirement. To conduct a statewide petition drive in Indiana, new partisan and independent candidates must circulate multiple copies of the same petition – a different form for each county in which voters reside – throughout the state, then retrieve,

separate by county and deliver thousands of pages of petitions to 92 different locations statewide. Such an effort strains the resources of the most well-funded campaigns, and it is a practical impossibility for non-wealthy grassroots campaigns. (SMF ## 9-10) As set forth below, *see infra* Part II.C, the cost of complying with the Petitioning Procedure in 2022 now approaches $500,000 or more.

The Vote Test adds yet another burden to new parties seeking to become ballot-qualified in Indiana, because it is measured as a percentage of the vote for Secretary of State, and the office of Secretary of State is only elected every four years, in non-presidential election cycles. *See* IC 3-8-4-1. That makes it impossible, under Indiana law, to form a new political party and retain ballot access in presidential election years. Furthermore, the Vote Test does not apply to independent candidates at all. That make it impossible, under Indiana law, for an independent candidate to remain ballot-qualified no matter how many votes the candidate receives. (SMF #5.) An incumbent independent who wins election to office is still required to petition for ballot access in order to run for reelection. *See id.*

The Vote Test also burdens unqualified new parties and ballot-qualified Minor Parties by compelling them to prioritize the election for Secretary of State above all others, because that is the only election by which they can obtain or retain ballot-qualified status under Indiana law. This distorts the parties' political, electoral and financial priorities. It obliges them to redirect their resources away from races for higher-profile offices that present the parties' best opportunity to grow and build support among the electorate, and toward a race for a largely administrative office that garners little attention among the electorate. (SMF #12); *see* McMahon Decl. ¶¶ 15-26; Rutherford Decl. ¶¶ 7-10; Wolfe Decl. ¶¶ 5, 12.

### `3.    The Challenged Provisions Impose Unequal Burdens.

Indiana's Major Parties and their candidates and voters do not suffer any of the foregoing

burdens. The Challenged Provisions do not impact them at all. Instead, Major Parties select their nominees by means of taxpayer-funded primary elections. (SMF #15.) Taxpayer funds pay for every aspect of the Major Parties' primary elections, down to the last paper clip. *Id*. In the 2020 election cycle, Indiana spent $14,676,849.66 in taxpayer funds on the Major Parties' primary elections – an expenditure that was typical of recent election cycles. (SMF #16). Once the Major Parties select their nominees, the candidates appear on Indiana's general election ballot automatically. (SMF #17.) Neither the candidates nor the Major Parties incur any expense in connection with their candidates' qualification for Indiana's general election ballot. (SMF #18.)

New partisan and independent candidates, by contrast, must bear the entire cost of complying with the Challenged Procedures – Indiana does not even provide them with the petitions they must circulate. New partisan and independent candidates therefore must print or photocopy the thousands of petition pages they need to complete a statewide petition drive at their own expense. That expense, however, is trivial compared to the total cost of the petition drive itself.

The uncontested evidence demonstrates that all-volunteer petition drives for statewide candidates have rarely succeeded, if ever, in the nearly 40 years since Indiana quadrupled the Signature Requirement in 1984. (SMF #14.) No statewide petition drive – volunteer or paid – has succeeded in the last 23 years and counting. (SMF #1.) The last successful statewide petition drive, for the Reform Party's Patrick Buchanan in 2000, cost more than $350,000 and was possible only because Buchanan qualified for millions of dollars in public matching funds and had a veritable army of paid petition circulators working on it. (SMF #7); *see* Buchanan Decl. ¶ 13. Similarly, the Reform Party's successful statewide petition drive in 1996 was possible only because its presidential candidate Ross Perot was a billionaire who spent $11-$12 million on his petition drives nationwide, a substantial portion of which funded his petition drive in Indiana.

*See* Verney Decl. ¶¶ 4, 15, 18.

More than two decades later, the cost of a statewide petition drive has only increased. The uncontested evidence demonstrates that the cost in 2022 ranged from $465,000 to $565,000. (SMF #11); *see* Wetterer Decl. ¶¶ 5-6. Such costs are staggering. They are also insurmountable for non-wealthy candidates and parties, including Plaintiffs. (SMF ##7-10, 13); *see* McMahon Decl. ¶¶ 31-34; Brand Decl. ¶¶ 8-9; *see also* Kafoury Decl. ¶ 19; Stein Decl. ¶ 9; Hawkins Decl. ¶ 11. The Challenged Provisions thus run afoul of *Anderson*, because they restrict Plaintiffs' participation in Indiana's electoral process based on their economic status. *See Anderson*, 460 U.S. at 793 & n.15. And because every other non-wealthy candidate and party is similarly restricted, the Challenged Provisions "operate to freeze the political status quo." *Jenness*, 403 U.S. at 438.

Finally, unlike new parties or qualified Minor Parties, Major Parties need not concern themselves with the Vote Test. Although Major Parties must comply with it to remain ballot-qualified, they are virtually guaranteed to receive 2 percent of the vote simply by running a candidate for any office, including Secretary of State. The distorting effects of the Vote Test thus fall on new or qualified Minor Parties alone. And because the Vote Test does not even apply to independents, they are unequally burdened in that they have no means under Indiana law to remain ballot-qualified.

### 4. The Severe and Unequal Burdens Imposed By the Challenged Provisions Have Devastated Plaintiffs' Ability to Participate in Indiana's Electoral Process.

Start with Plaintiff INGP. INGP is a relatively new grassroots party that has never qualified for Indiana's ballot despite making a concerted effort to do so by means of a volunteer petition drive for its candidate for Secretary of State in 2018. *See* Muehlhausen Decl. ¶¶ 6-18. INGP lacks the funds to pay for a successful statewide petition drive and it has no reasonable

expectation of raising the funds necessary to do so. *See* Brand. Decl. ¶¶ 8-9. Simply put, INGP –

like any other non-wealthy new party – has no realistic expectation that it will ever become

ballot-qualified under current law. *See id.* Faced with that stark reality, INGP struggles to retain

its current members, much less to grow as a party. *See id*. ¶ 9; *see* Tucker Decl. ¶ 3;

Muehlhausen Decl. ¶ 4.

Plaintiff LPIN is currently ballot-qualified but it too lacks the funds necessary to conduct

a successful statewide petition drive. (SMF #13.) As a result, it must prioritize the election for

Secretary of State over all other elections. (SMF #12.) This distorts LPIN's political, electoral

and financial priorities and harms its ability to grow as a party and build support among the

electorate. *Id*. When the office of Secretary of State is up for election, LPIN diverts all of its

time, money and resources to supporting its candidate in that race. *Id*. Rather than recruiting its

best candidates for higher-profile offices such as Governor and United States Senator, LPIN

must run them for Secretary of State – an election that few voters know or care about. *See*

McMahon Decl. ¶¶ 15-19; Rutherford Decl. ¶¶ 6-7. LPIN is nonetheless obliged to pursue these

actions because its candidate for Secretary of State must receive at least 2 percent of the vote for

LPIN to remain ballot-qualified. *See* McMahon Decl. ¶¶ 15-19. If LPIN loses that status, it has

no realistic expectation of qualifying again under current law. (SMF #13.)

The harm caused by the Challenged Provisions ultimately falls upon Indiana voters,

including Plaintiffs, who have been systematically deprived of the opportunity to vote for any

new partisan or independent candidate for statewide office for 23 years and counting. *See* Brand

Decl. ¶ 12; Muehlhausen Decl. ¶ 3; Tucker Decl. ¶ 4; Wetterer Decl. ¶ 14; Wolfe Decl. ¶ 3. With

rare exceptions in down-ballot races, INGP's members have never had the opportunity to cast a

vote for the candidates they support. *See* Brand Decl. ¶ 12; Muehlhausen Decl. ¶ 3; Tucker Decl.

¶ 4; Wetterer Decl. ¶ 14; Wolfe Decl. ¶ 3. The independent voter Plaintiffs, including Plaintiff

Tucker and Plaintiff Muehlhausen suffer the same injury. *See* Muehlhausen Decl. ¶ 3; Tucker Decl. ¶ 4.

## VII.   THE CHALLENGED PROVISIONS ARE NOT NARROWLY TAILORED TO SERVE COMPELLING STATE INTERESTS.

When election laws impose "severe" burdens, as the Challenged Provisions do, they must be "narrowly drawn to advance a state interest of compelling importance." *Burdick*, 504 U.S. at 434 (citation and quotation marks omitted). The Challenged Provisions fail that test on multiple grounds. The Secretary has not genuinely asserted that they further any legitimate state interests, and the record contains affirmative, uncontested evidence that they were never intended to do so. (SMF ##19-22.) The Challenged Provisions also are not narrowly tailored. Accordingly, based on the uncontroverted record here, the Challenged Provisions cannot withstand scrutiny under the *Anderson-Burdick* analysis.

### A.   The Challenged Provisions Are Not Narrowly Tailored.

In the history of American elections, since states began regulating access to the ballot, no state that has imposed a requirement of more than 5,000 signatures for statewide office has ever had more than eight candidates on the ballot for President, United States Senate or Governor, with just three exceptions in New York. (SMF ##24-25); *see* Winger Decl. ¶¶ 6-7. Indiana's regulatory interests would not be implicated if eight candidates appeared on its general election ballot. *See Williams*, 393 U.S. at 47 (Harlan, J. concurring) (opining that "the presence of eight candidacies cannot be said, in light of experience, to carry a significant danger of voter confusion."); *see also Hall*, 766 F.2d at 1173 (observing that Indiana's previous 0.5-percent signature requirement had been sufficient to limit ballot access to a "tolerable" number of candidates for at least 40 years). (SMF #28.) Indeed, many states frequently accommodate more than eight candidates on their presidential primary ballots without problem. (SMF ##26-27); *see*

Winger Decl. ¶¶ 8-9. Indiana itself has adequately limited access to its primary ballot by imposing a requirement of just 4,500 signatures. *See* Winger Decl. at ¶ 11.

The Supreme Court has acknowledged that "any fixed percentage requirement is necessarily arbitrary," in that a somewhat lower requirement might suffice as well as the state's chosen requirement. *American Party of Texas v. White*, 415 U.S. 767, 783 (1974). At the same time, however, "even when pursuing a legitimate interest, a State may not choose means that unnecessarily restrict constitutionally protected liberty," and consequently, "we have required that States adopt the least drastic means to achieve their ends." *Illinois Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 185 (1979) ("This requirement is particularly important where restrictions on access to the ballot are involved."). Here, Indiana's Signature Requirement is greater, by orders of magnitude, than necessary to protect its legitimate regulatory interests. It is not narrowly tailored.

Similarly, for most of Indiana's history, the state maintained orderly elections using deadlines that were much later than the current June 30 filing deadline. (SMF #31); *see* Winger Decl. ¶ 14. While a state's choice of deadline may be "arbitrary" in the same sense as its choice of signature requirement, *see American Party of Texas*, 415 U.S. at 783, the record evidence demonstrates that the June 30 deadline is not necessary to prevent harm to Indiana's electoral processes. And like the Signature Requirement, Indiana's Filing Deadline is also not narrowly tailored. (SMF ##32-33.)

The uncontested evidence also demonstrates that, despite the endemic deficiencies of the Petitioning Procedure, Indiana has not materially updated or improved it in the 134 years since it was first adopted in 1889. Indeed, the Secretary admits that alternative procedures, which would more effectively enable candidates to demonstrate the requisite modicum of support under Indiana law, have never been considered. The Petitioning Procedure, too, is not narrowly

tailored.

Finally, Indiana has never had an overcrowded ballot. (SMF ##28-29.) It did not have an overcrowded ballot prior to 1986, when the current 2-percent Vote Test took effect, nor did it have an overcrowded ballot prior thereto, when the Vote Test was only 0.5 percent. (SMF #28.) Like the Signature Requirement, therefore, the Vote Test is greater, by orders of magnitude, than necessary to protect Indiana's legitimate regulatory interests. Additionally, the Vote Test absolutely prohibits independent candidates and new parties that form in presidential election years from retaining ballot-qualified status. It is not narrowly tailored.

**B.      The Uncontested Evidence Demonstrates That the Current Signature Requirement and Vote Test Were Not Intended to Serve Legitimate State Interests.**

The requirement that the Court "identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule," and then "determine the legitimacy and strength of each of those interests" is especially important in this case. *Anderson*, 460 U.S. at 789. Recall that in *Hall*, the election official defendants failed to assert any state interest to justify Indiana's newly-quadrupled Signature Requirement – a failure that would have spelled "trouble" but for the deferential standard of review applied in that case. *Hall*, 766 F.2d at 1173. Although the Court upheld the Signature Requirement, it acknowledged that evidence of "invidious intent" could change the analysis. *See id.* at 1176.

The record in this case contains such evidence. Plaintiffs' witness Mitchell V. Harper was an elected member of the Indiana State House when the legislation quadrupling the Signature Requirement and Vote Test was introduced. *See* Harper Decl. ¶¶ 6, 9. Former Rep. Harper was directly involved in the process from the time the legislation was introduced in committee to the debate – or lack thereof – before the full House to final enactment. (SMF ##19-22); *see* Harper Decl. ¶¶ 9-22. According to former Rep. Harper's first-hand, eyewitness account, he "never

heard any Representative mention a regulatory interest that the legislation was intended to protect or identify any reason why it should apply to statewide, congressional and legislative races." *Id.* ¶ 29. Instead, former Rep. Harper attests, the legislation "was never intended as anything more than political score settling" precipitated by the presence of an independent candidate on the ballot in the 1980 mayoral election in Michigan City, Indiana. *Id.* ¶¶ 29, 12-17.

## C.   Less Burdensome Alternatives Are Available to Protect Indiana's Legitimate Regulatory Interests.

The historical record establishes that Indiana could adopt a lower signature requirement and later filing deadline and still protect its legitimate regulatory interests – just as it did for its entire history prior to 1980. Indiana could also reduce the burdens imposed by the Challenged Provisions by updating and improving its 134-year-old Petitioning Procedure. Electronic petitioning platforms are available, which greatly alleviate the administrative burden and costs imposed by Indiana's archaic paper-based procedures.[2] *See* McReynolds Decl. ¶¶ 13-17. Both the District of Columbia and the State of Arizona have adopted such platforms. *See id.* at 25; *see also* Arizona Secretary of State, *E-Qual*, https://apps.azsos.gov/equal/ (last visited May 2, 2023) (Arizona's web-based petitioning platform). In addition to reducing the burden and cost of using paper nomination petitions, such platforms automatically validate voters' signatures, which would greatly reduce the cost of complying with the Signature Requirement by eliminating the need for candidates to exceed it by 50 percent or more. *See* McReynolds Decl. ¶ 20. Such platforms are also ADA-compliant because they enable blind people to sign without assistance. *See id.* ¶ 21. Finally, the Secretary admits that no state interest is served by requiring that

---

[2] When the Covid-19 pandemic arose, many states adopted electronic petitioning procedures on short notice, either voluntarily or by court order. *See, e.g., Libertarian Party of Il. v. Pritzker*, 455 F. Supp. 3d 738 (N.D. Ill. 2020) (requiring Illinois to adopt accept electronically signed petitions in 2020 election), *aff'd, Libertarian Party of Illinois v. Cadigan*, 824 Fed. Appx. 415 (7th Cir. 2020); *Green Party of Md. v. Hogan*, No. 1:20-cv-1253 (D. Md. June 19, 2020); *Goldstein v. Sec. of the Commonwealth*, 142 NE 3d 560 (Mass. 2020). None of these states reported any problems arising as a result of these new procedures. Indiana could do the same here.

candidates submit nomination petitions directly to county boards of voter registration – they could also submit them directly to the office of the Secretary of State. This, too, would substantially alleviate the burden of complying with the Petitioning Procedure.

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs summary judgment as to Count I and Count II of the Complaint.

DATED: May 8, 2023                 Respectfully submitted,

*/s/ Oliver B. Hall*

**OLIVER B. HALL**
(Admitted PHV)
CENTER FOR COMPETITIVE DEMOCRACY
P.O. Box 21090
Washington, DC 20009
(202) 248-9294
oliverhall@competitivedemocracy.org

**MARK R. BROWN**
(Admitted PHV)
303 E. Broad Street
Columbus, OH 43215
614-236-6590
Mbrown@law.capital.edu

**WILLIAM P. TEDARDS, JR.**
(Admitted PHV)
1101 30th Street NW, Suite 500
Washington, DC 20007
(202) 797-9135
BT@tedards.net

Counsel for Plaintiffs