UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| INDIANA GREEN PARTY, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 1:22-cv-00518-JRS-DML |
| | ) | |
| v. | ) | |
| | ) | |
| DIEGO MORALES, in his official | ) | |
| capacity as Indiana Secretary of State, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF RESPONSE TO
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND CROSS
MOTION FOR SUMMARY JUDGMENT**

Defendant Diego Morales, in his official capacity as Indiana Secretary of State, by counsel, respectfully submits this memorandum in support of his Response and Cross-Motion for Summary Judgment. Plaintiffs' arguments regarding the Challenged Provisions ignore the State's legitimate interests, and overestimate the burden they create. Consequently, Defendants respectfully request the Court deny Plaintiffs' Motion for Summary Judgment and grant summary judgment in the Secretary's favor.

# TABLE OF CONTENTS

Table of Authorities…………………………………………………………….........ii

Introduction……………………………………………………………………………1

Background………………………………………………………………………….…2

Statement of Material Facts …………………………………………..……………….4

Procedural History…………………………………………………………………….4

Standard of Review……………………………………………………………..……..5

    A.  Summary Judgment……………………………………………………………5
    B.  The *Anderson-Burdick*  Test……………………………………,,,……………6

Argument……………………………………………………………………………….8

    A.  Ballot Access is Not Unconstitutionally Restricted Where the Secretary has
        Provided Legitimate State Interests…………………………….……………8
    B.  The Challenged Provisions Do Not Place Severe Burdens on a Candidate's
        Constitutional Rights…………………………………………………………13
        1.  Neither Plaintiffs' Right to Vote nor their Right to Freedom of
            Association is Impeded……………………………………………13
            a)  Indiana's 2% Signature Requirement is Not Overly
                Burdensome, and is Justified by Compelling State
                Interests…………………………………………………15
            b)  Indiana's Filing Deadline is Not Overly Burdensome, and is
                Justified by Compelling State Interests……………………17
            c)  The Petitioning Procedure Does Not Impose
                Unconstitutional Burdens……………………………..……19
            d)  The Vote Test Does Not Make Ballot Access Impossible..…21
            e)  The Challenged Provisions Do Not Create Unequal
                Burdens……………………………………………………23
            f)  f) The Challenged Provisions Do Not Preclude Plaintiffs'
                Ability to Participate in Indiana's Electoral Process……….26
        2.  Indiana is not required to enact hypothetical, less burdensome
            alternatives………………………………………………………...27

Conclusion……………………………………………………………………….…28

## TABLE OF AUTHORITIES

**Cases**

*Acevedo v. Cook Cnty. Officers Electoral Bd.*, 925 F.3d 944 (7th Cir. 2019)……...…27

*Anderson v. Celebrezze*, 460 U.S. 780 (1983)……………………………...…2, 6-7, 14

*Burdick v. Takushi*, 504 U.S. 428, 112 S. Ct. 2059, 119 L. Ed. 2d 245
(1992)………………………………………………………………...…2, 6-7, 14

*Celotex Corp. v. Catratt,* 477 U.S. 317, 323 (1986)………………………………..5, 6

*City of New Orleans v. Duke*, 427 U.S. 297, 303 (1976)………………...……………7, 10

*Dean Foods Co. v. United Steel Workers of Am.*, 911 F. Supp. 1116 (N.D. Ind.
1995)……………………………………………………………………………..6

*Dunn v. Blumstein*, 405 U.S. 330 (1972)………………………………………….…18

*Hall v. Simcox*, 766 F.2d 1171 (7th Cir. 1985)………………………………….12, 15

*Illinois State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 99 S. Ct. 983,
59 L. Ed. 2d 230 (1979)……………………………………………………….…13

*Jenness v. Fortson*, 403 U.S. 431, 91 S. Ct. 1970, 29 L. Ed. 2d 554
(1971)……………………………………………8, 15-16, 18-19, 23-25, 27

*Lujan v. Nat'l Wildlife Fed'n.*, 497 U.S. 871 (1990)………………………………..…..6

*Norman v. Reed*, 502 U.S. 279 (1992)…………………………………..……………8, 13-14

*Storer v. Brown*, 415 U.S. 724 (1974)…………………………………7, 14, 16-17, 20, 21

*Walter v. Fiorenzo*, 840 F.2d 427 (7th Cir. 1988)……………………………...…….6

*Williams v. Rhodes*, 393 U.S. 23, 89 S. Ct. 5, 21 L. Ed. 2d 24 (1968)…….18-19, 23-24

**Bill of Rights**

U.S. Const. amend. I……………………………………………………..1, 5-7, 13

U.S. Const. amend. XIV …………………………………………….……1, 5-7, 13, 27

**<u>Statutes</u>**

Ind. Code § 3-8-2-2…………………………………………………..…………2

Ind. Code § 3-8-2-4…………………………………………………..……9, 14

Ind. Code § 3-8-4-1………………………………………………….....1, 3, 21

Ind. Code § 3-8-4-10………………………………………………………….3

Ind. Code § 3-8-6-3…………………………………………………1, 3, 9, 14

Ind. Code § 3-8-6-6………………………………………………………1, 3

Ind. Code § 3-8-6-10(a)…………………………………………………1, 3

Ind. Code § 3-8-6-10(b)…………………………………………………1, 3

Ind. Code § 3-10-1-2………………………………………………………….2

Ind. Code § 3-10-2-15…………………………………………………………3

Ind. Code 3-13-1-7…………………………………………………………….3

**<u>Rules</u>**

S.D. Ind. L.R. 56-1(b) ………………………………………………………4

Fed R. Civ. P. 12(B)(6) ……………………………………………………5

Fed. R. Civ. P. 56(a) ………………………………………………………5

Fed. R. Civ. P. 56(e) ………………………………………………………6

## INTRODUCTION

As the Indiana General Assembly has decided the 2% Signature Requirement is needed to protect the State's interest, a lower signature requirement would not suffice. Exhibit 1 ("Bonnet Aff.") ¶ 18. Further, the State has an inherent interest in requiring an early filing deadline as the State requires the necessary time to fulfill its other election- and ballot-related obligations to Indiana citizens, which involves a rigorous process that requires careful planning. The roughly four months for signature gathering allowed by the Challenged Provisions ensures Indiana has adequate time to organize its electoral proceedings. *Id.* ¶ 19-20. Therefore, the Court should deny Plaintiff's Motion for Summary Judgment and grant summary judgment in favor of the Secretary.

Plaintiffs challenge the Indiana statutes that govern minor party and independent candidate access to have their name printed on the ballot. The statutes at issue include Indiana Code sections 3-8-6-3, 3-8-6-6, 3-8-6-10(a), 3-8-6-10(b), and 3-8-4-1 (collectively, the "Challenged Provisions"). Plaintiffs contend that, when taken as a whole, the Challenged Provisions violate their First and Fourteenth Amendment Rights. [ECF 60 ("Pl.'s Memo") at 13]. Specifically, they contend the Challenged Provisions create a severe burden that is unequal to that afforded to major parties that the state interests do not justify.

Contrary to Plaintiffs' assertions, the Challenged Provisions do not create an unequal, severe burden because the compelling state interest provided by the Secretary justifies the passage of the Challenged Provisions. As the Secretary has

provided the compelling state interests and Plaintiffs have not shown how the restrictions are severe, under the *Anderson-Burdick* analysis, the Court need only review this matter for a rational basis for the Challenged Provisions. *Burdick v. Takushi*, 504 U.S. 428, 112 S. Ct. 2059, 2060, 119 L. Ed. 2d 245 (1992); *see also Anderson v. Celebrezze*, 460 U.S. 780, 780 (1983). When viewed through the lens of rational basis, the Challenged Provisions easily pass muster, as the Defendant has provided multiple legitimate state interests rationally related to the Challenged Provisions.

Even if the Court determines the Challenged Provisions create a severe burden, the Plaintiffs' arguments still fail. The Challenged Provisions are narrowly tailored to support the State's compelling interests, and consequently they satisfy even the higher level of scrutiny available under the *Anderson-Burdick* analysis. The Court should therefore deny Plaintiffs' Motion for Summary Judgment and grant summary judgment in the Secretary's favor.

## BACKGROUND

Under Indiana law, a political party whose nominee received at least 10% of the votes cast in the election for Secretary of State must hold a primary election to select its nominees for federal, state, and local offices for the next general election. I.C. § 3-10-1-2; I.C. § 3-8-2-2; *see also* Bonnet Aff. ¶ 4. If a political party's nominee received less than 10 percent but more than 2 percent of the votes in the election for Secretary of State, that party must select its candidates for local, state, and federal

offices at a party convention. *See* Ind. Code §§ 3-13-1-7; 3-10-2-15; 3-8-4-10 *see also* Bonnet Aff. ¶ 5–6.

An independent candidate or a candidate who "represents a political party not qualified to nominate candidates in a primary or by convention" (a "minor party") achieves ballot access by satisfying certain statutory requirements. *See* Ind. Code § 3-8-6 *et seq*.; *see also* Bonnet Aff. ¶ 7. First, candidates must gather nomination petitions signed by eligible voters equal in number to 2% of the total votes for Secretary of State in the prior election (the "Signature Requirement"). I.C. § 3-8-6-3; *see also* Bonnet Aff. ¶ 8. The petitions must be signed and submitted to the appropriate county board of election (the "Petitioning Procedure"), I.C. §§ 3-8-6-6, -10(a), on or before June 30 of the election year in which the candidates run (the "Filing Deadline"). I.C. § 3-8-6-10(b); *see also* Bonnet Aff. ¶ 9.

Once qualified for the general election ballot, a minor party will maintain ballot access if its candidate secures 2% of the votes cast in the election for Secretary of State (the "Vote Test"). I.C. § 3-8-4-1; *see also* Bonnet Aff. ¶ 11. This retention provision does not apply to independent candidates without political party affiliation. *See* I.C. § 3-8-4-1; *see also* Bonnet Aff. ¶ 12. In 1980, Indiana increased the prior signature requirement of 0.5% to 2%. Bonnet Aff. ¶ 13

The General Assembly properly enacted the relevant statutes, they were tested in *Hall*, and the Secretary has provided Plaintiffs with the following compelling state interests in support of the Challenged Provisions:

- The State's regulatory interest in conducting an orderly election;

3

- The State's interest in ensuring voter confidence in the accuracy and fairness of candidate selection for parties with significant public support;
- The State's interest in avoiding voter confusion;
- The State's interest in avoiding voter frustration with the democratic process;
- The State's interest in avoiding ballot overcrowding;
- The State's interest in gauging whether a party enjoys a modicum of support deserving ballot access;
- The State's interest in ensuring the widest-possible base of voter engagement in as much as the election/political process as possible;
- The State's interest in ensuring the political parties with significant public support are complying with relevant campaign finance and other election-related statutes; and
- The State's interest in conserving the limited resources devoted to public financing of elections.

*Id.* ¶ 17.

## STATEMENT OF MATERIAL FACTS

To the extent that it contains facts, and not opinions or argument, Defendants accept the statement of the facts as laid out by Plaintiffs. To the extent the Secretary has any disagreement with the facts as described by Plaintiffs, those disagreements do not reach facts that are actually material to the resolution of this case. As such, those disagreements need not be listed here, as the Local Rules require a listing of only those facts that are material to the resolution of the issue. *See* S.D. Ind. L.R. 56-1(b).

## PROCEDURAL HISTORY

On March 17, 2022, Plaintiffs filed their Complaint for Declaratory and Permanent Injunctive Relief, [ECF 1 ("Compl.")], asserting two claims against

Defendant Secretary of State Diego Morales[1] ("the Secretary") in his official capacity. Plaintiffs claim the Challenged Provisions violate their rights under the First and Fourteenth Amendments to the United States Constitution, and specifically raise a claim under the Equal Protection Clause. Compl. ¶¶ 94-99. Plaintiffs request the Court find the Challenged Provisions unconstitutional, enjoin the Secretary from enforcing the Challenged Provisions against Plaintiffs, and grant further relief as appropriate. Compl. ¶ 100.

On May 18, 2022, the Secretary filed a motion to dismiss pursuant to Fed R. Civ. P. 12(b)(6). [ECF No. 17]. On October 28, 2022, the Court denied that motion. [ECF No. 35.] The parties proceeded to take discovery. Following the completion of discovery, Plaintiffs filed their Motion for Summary Judgment. Defendant now responds and moves for summary judgment in his favor.

## STANDARD OF REVIEW

### A. Summary Judgment

Pursuant to Fed. R. Civ. P. 56(a), summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The movant has the initial burden of production to "demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catratt,* 477 U.S. 317, 323 (1986). Once the moving party has met this burden, the

---

[1] The original named Defendant in this lawsuit was Holli Sullivan, who was Indiana's Secretary of State until January 2023.

nonmovant must establish the existence of a genuine issue for trial. Fed. R. Civ. P. 56(e); *Lujan v. Nat'l Wildlife Fed'n.*, 497 U.S. 871, 884 (1990).

The nonmovant may not rely on the mere allegations of his pleadings to defeat the motion for summary judgment. Fed R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324. Nor may the nonmovant defeat summary judgment by challenging the credibility of a supporting affidavit. *Walter v. Fiorenzo*, 840 F.2d 427, 434 (7th Cir. 1988). If the non-moving party fails to establish the existence of an essential element of the case on which he bears the burden of proof at trial, summary judgment is appropriate. *Celotex*, 477 U.S. at 322. When cross-motions for summary judgment are filed, "the court is not required to grant judgment as a matter of law for one side or the other." *Dean Foods Co. v. United Steel Workers of Am.*, 911 F. Supp. 1116, 1122 (N.D. Ind. 1995) (internal citations omitted). "Rather, the court must evaluate each party's motion on its own merits, resolving factual uncertainties and drawing all reasonable inferences against the party whose motion is under consideration." *Id.*

## B. The *Anderson-Burdick* Test

Challenges to a State's electoral scheme are evaluated using the *Anderson-Burdick* standard. Under the *Anderson-Burdick* standard, a court "must weigh the character and magnitude of the asserted injury to the First and Fourteenth Amendment rights. . . against the precise interests put forward by the State as justification for the burden imposed by its rule[.]" *Burdick*, 504 U.S. 428, 112 S. Ct. at 2060; *see also Anderson*, 460 U.S. at 780. During its review, the court should "tak[e]

into consideration the extent to which [the state's] interests make it necessary to burden the plaintiff's rights." *Burdick,* 112 S. Ct. at 2060; *see also Anderson*, 460 U.S. at780. A "regulation must be narrowly drawn to advance a state interest of compelling importance only when it subjects the voters' rights to 'severe' restrictions." *Burdick,* 112 S. Ct. at 2061. While legislative schemes regulating elections "inevitably affect[] . . . the individual's right to vote and his right to associate with others for political ends, the state's important regulatory interests are generally sufficient to justify reasonable, nondiscriminatory restrictions." *Anderson*, 460 U.S. at 788. This flexible framework "depends upon the extent to which a challenged restriction burdens First and Fourteenth Amendment rights." *Burdick*, 112 S. Ct. at 2063.

If a "reasonably diligent independent candidate" can fulfill the statutory requirements, the regulatory scheme should be deemed valid. *Storer v. Brown*, 415 U.S. 724, 742 (1974). Further, "[u]nless a classification trammels fundamental personal rights or is drawn upon inherently suspect distinctions such as race, religion, or alienage, [the Court's] decisions presume the constitutionality of the statutory discriminations and require only that the classification challenged be rationally related to a legitimate state interest." *City of New Orleans v. Duke*, 427 U.S. 297, 303 (1976). Also, "States are accorded wide latitude in the regulation of their local economies under their police powers, and rational distinctions may be made with substantially less than mathematical exactitude." *Id*.

In this case, the challenged regulatory provisions are not severely burdensome and do not "trammel fundamental personal rights." *Id*. The Secretary has provided

the State's administrative and regulatory interests in support of the Challenged Provisions. *See* Bonnet Aff. ¶ 17. The Challenged Provisions do not prevent parties from running for election simply because they are smaller—they merely require a showing of a significant modicum of support to have a candidate's name placed on the ballot. As the Challenged Provisions impose only "'reasonable, nondiscriminatory restrictions,'" the Court need only confirm the State has supplied important interests to justify the scheme and need not require narrow tailoring of the Challenged Provisions. Nevertheless, even if the Court determines narrow tailoring is required, the Challenged Provisions are narrowly tailored to advance the compelling interests of Indiana.

## ARGUMENT

### A. Ballot Access is Not Unconstitutionally Restricted where the Secretary has Provided Legitimate State Interests

This Court should review the Challenged Provisioned using a rational basis standard, as the burdens imposed by the Challenged Provisions are not severe and do not mandate a higher level of scrutiny. *See Jenness v. Fortson*, 403 U.S. 431, 442 (1971) and *Norman v. Reed*, 502 U.S. 279, 280 (1992). The burdens identified by Plaintiffs relate to their rights of association, their right to form and direct the action of political parties, and their rights to vote for a candidate of their choosing. None of these rights are severely burdened by the Challenged Provision, and thus the rational basis standard of review should apply.

First, the Challenged Provisions do not prevent a voter from voting for their chosen candidate, a candidate from running for their chosen office, or voters from associating with their party of choice. Nor do they mandate how political parties make strategy decisions as they attempt to grow and serve their base. Indiana's statutes, including the Challenged Provisions, place no limitation on who an individual may vote for or if a person may announce a candidacy and run for political office. Nor does Indiana law prevent individuals from assembling, discussing ideas, and forming political parties. Instead, Indiana provides differing pathways to the ballot and ballot box depending on the levels of support and engagement available to individuals. For example, a candidate without ballot access may submit a petition of nomination, signed by at least "two percent (2%) of the total vote cast at the last election for secretary of state in the election district that the candidate seeks to represent." I.C. 3-8-6-3(a). Independent candidates and Minor Parties therefore have nearly six months to circulate petitions for nomination and obtain the required number of signatures. I.C. § 3-8-2-4. If a candidate without ballot access does not obtain enough signatures before the deadline and wishes to run as a write-in candidate, they (or anyone else who intends to run a write-in campaign) can file a declaration of intent. I.C. § 3-8-2-4(b). Taken in combination, these two pathways to the ballot, along with the other options for bigger parties contained in the Indiana election code, provide a method for any candidate or political party of any size or level of support to participate in elections, and allow for a voter to express their support for any candidate they wish. In short, Plaintiffs are not deprived of the ability to run candidates for office, to

associate with like-minded individuals, or to cast a vote for a candidate of their preference. What they lack is the ability to do so in the way that they would prefer. But Plaintiffs' disappointment that their preferences are not satisfied by the Challenged Provisions does not make those provisions severely burdensome, nor does it make them unconstitutional.

Given that the burdens here are not severe, review takes the lighter, rational-basis approach. *See City of New Orleans,* 427 U.S. at 303 ("[u]nless a classification trammels fundamental personal rights or is drawn upon inherently suspect distinctions such as race, religion, or alienage, our decisions presume the constitutionality of the statutory discriminations and require only that the classification challenged be rationally related to a legitimate state interest."). There are clear rational bases for the Challenged Provisions. The Challenged Provisions serve a number of interests including the 1) the State's regulatory interest in conducting an orderly election; 2) the State's interest in ensuring voter confidence in the accuracy and fairness of candidate selection for parties with significant public support; 3)the State's interest in avoiding voter confusion; 4) the State's interest in avoiding voter frustration with the democratic process; 5) the State's interest in avoiding ballot overcrowding; 6) the State's interest in gauging whether a party enjoys a modicum of support deserving ballot access; 7) the State's interest in ensuring the widest-possible base of voter engagement in as much as the election/political process as possible; 8) the State's interest in ensuring the political parties with significant public support are complying with relevant campaign finance

10

and other election-related statutes; and 9) the State's interest in conserving the limited resources devoted to public financing of elections. Bonnet Aff. ¶ 17. All of these interests provide a rational basis supporting the Challenged statutes.

The Challenged Provisions create a regulatory scheme that requires parties to display a certain level of support before being printed on the ballot, and the scheme is rationally related to the interests provided by the State. For example, it is entirely rational for the State to look for a level of engagement with and support for candidates of a certain party before the State expends resources and time in printing that party's candidate on the ballot. *Id.* Further, it is rational for the State to have safeguards in place to guard against joke candidates, or candidates attempting to divert votes from parties or candidates they dislike. *Id.* Moreover, it is entirely rational to focus the majority of the State's resources on ensuring the confidence and participation of the public in the election process by requiring primary elections, with all of the levels of election security and public accessibility, for the two most-supported parties in the State. *Id.*

Finally, the Secretary has provided the State interests in regulating the electoral process, *see id.* ¶ 17, and those interests are not related to suspect distinctions. Contrary to Plaintiffs' claims that the heightened Signature Requirement was not implemented due to legitimate state interests, [ECF No. 60-4 at ¶¶ 12-29], Plaintiffs have not provided any evidence, other than one legislator's statement, that the revision to the statutes had no argument, that the State does not have the interests as provided by the Secretary. *See* Pl.'s Exhibit 3.

11

The year before Indiana introduced the Signature Requirement, there were eight candidates on the ballot. *Hall v. Simcox*, 766 F.2d 1171, 1172 (7th Cir. 1985). Further, the Secretary has confirmed that reduction of voter confusion is a State interest in the Challenged Provisions. Bonnet Aff. ¶ 17. Also, the Secretary has confirmed other legitimate state interests, such as orderly elections and voter confidence, *see id.*, that would provide the rational basis for the Challenged Provision. Mr. Harper's affidavit notwithstanding, the testimony of one single former legislator is not sufficient to limit the legitimate state interests that have been protected since the passage of the Challenged Provisions.

As Indiana does not maintain an official legislative history, let alone one that would give official state interests in the legislation, one legislator's opinion that no compelling state interest was being protected is irrelevant. But none of this is relevant—under a rational basis standard, and absent suspect distinctions, this Court need only search for a rational basis for the statutes, which has been more than satisfied by the interests put forward by the Secretary. The burdens posed by the Challenged Provisions are not severe, and are plainly rationally related to the interests put forward by the State. This Court's review need go no further—the Statutes are constitutional, and this Court should accordingly grant summary judgment in favor of Defendant.

**B. The Challenged Provisions Do Not Place Severe Burdens on a Candidate's Constitutional Rights**

Even if the Court determines that the burdens imposed by the Challenged Provisions require a higher level of scrutiny, the Challenged Provisions pass muster, as under the *Anderson-Burdick* analysis, neither the character nor magnitude of the Challenged Provisions severely burden the fundamental rights of Plaintiffs. As discussed in part above, the Challenged Provisions require lower thresholds than many other states, and when taken as a whole, do not limit the political participation of voters, candidates, or political parties in Indiana's electoral process. Bonnet Aff. ¶ 21. Instead, they seek to confirm that a party has a modicum of support for its candidates, and ensures that those candidates with larger bases of support are moving through an electoral process that matches the scale of that support, and ensures public trust in election security and election outcomes. Bonnet Aff. ¶ 17. The Challenged Provisions do not, as Plaintiffs claim, injure their fundamental rights, Pl.'s Memo at 17.

1. Neither Plaintiffs' Right to Vote Nor Their Right to Freedom of Association is Impeded

The right to vote "is of the most fundamental significance under our constitutional structure." *Illinois State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184, 99 S. Ct. 983, 990, 59 L. Ed. 2d 230 (1979). Further, the right to create and develop new political parties, as protected by the First and Fourteenth Amendments, has long been recognized by the Supreme Court. *Norman*, 502 U.S. at

13

288. "It does not follow, however, that the right to vote in any manner and the right to associate for political purposes through the ballot are absolute." *Burdick*, 112 S. Ct. at 2063.

Because burdening access to the ballot can indirectly burden the fundamental rights for all citizens, states must provide "feasible means for other political parties and other candidates to appear on the general election ballot." *Storer*, 415 U.S. at 728. But even where rights are fundamental, "not all restrictions imposed by the States on candidates' eligibility for the ballot impose constitutionally-suspect burdens on voters' rights to associate or to choose among candidates." *Anderson*, 460 U.S. at 788.

In this case, the Challenged Provisions do not prevent a voter from voting for their chosen candidate, a candidate from running for their chosen office, or voters from associating with their party of choice. After declaring their candidacy, *see* I.C. 3-8-2-4, a candidate without ballot access may submit a petition of nomination, signed by at least "two percent (2%) of the total vote cast at the last election for secretary of state in the election district that the candidate seeks to represent." I.C. 3-8-6-3(a). Independent candidates and Minor Parties therefore have nearly six months to circulate petitions for nomination and obtain the required number of signatures. I.C. § 3-8-2-4. If a candidate without ballot access does not obtain enough signatures before the deadline and wishes to run as a write-in candidate, they (or anyone else who intends to run a write-in campaign) can file a declaration of intent. I.C. § 3-8-2-4(b). Taken in combination, these two pathways to the ballot provide a method for

any candidate or political party of any size or level of support to participate in elections, and allow for a voter to express their support for any candidate they wish. What Plaintiffs are actually complaining about, it becomes clear, is not that they lack the ability to run candidates for office, or to associate with like-minded individuals, or to cast a vote for a candidate of their preference, but that they cannot do so in the way they would prefer. However, Plaintiffs' disappointment that their preferences are not satisfied by the Challenged Provisions does not make those provisions unconstitutional.

> a) *Indiana's 2% Signature Requirement is not overly burdensome, and is justified by compelling State interests*

Indiana's 2% requirement is not unduly burdensome, and is well in-line with other similar measures that have been found Constitutional. In 1980, Indiana increased the Signature Requirement from .5% to 2% of the number of voters in the last election for Secretary of State. *Hall*, 766 F.2d at 1172. This increase happened after the 1980 presidential election where eight presidential candidates appeared on Indiana's ballot. *Id*. This requirement itself has already been reviewed and upheld— the Seventh Circuit in *Hall* affirmed the Signature Requirement, even though, at the time *Hall* was decided, Indiana did not permit write-in votes. *Id*. And Indiana's 2% requirement is less than that found acceptable in other, states—the Court in *Jenness* determined that Georgia's requirement to collect signatures from 5% of eligible voters in a 180-day timeframe, coupled with its voters' ability to write in their candidate's name, "in no way freezes the status quo, but implicitly recognizes the potential fluidity of American political life." *Jenness*, 403 U.S. at 439-40. Such is the case here:

15

the Signature Requirement does not "freeze the status quo," as it provides multiple ways for candidates and parties to participate in (and succeed in) Indiana's elections at all levels. The Signature Requirement and related nomination petition procedure provides a threshold for one type of ballot access, *see* I.C. §§ 3-8 *et seq.*, but it is not the only type available—write-in candidacy is an option, and so is nomination by a party that already has ballot access. In such a situation, if the status quo is indeed "frozen" it is not the Signature Requirement doing the freezing—it is the opinions, and more importantly, the votes, of the electorate that have cooled things down.

Additionally, precedent argues against Plaintiffs' interpretation of the burdens created by the logistics of satisfying the Signature Requirement. Although Plaintiffs argue the impossibility of collecting the required number of signatures, the Court in *Storer* held that: "[s]tanding alone, gathering 325,000 signatures in 24 days would not appear to be an impossible burden. Signatures at the rate of 13,542 per day would be required, but 1,000 canvassers could perform the task if each gathered 14 signers a day." *Storer*, 415 U.S. at 740. The Court further reasoned that the statute did not require an "impractical undertaking for one who desires to be a candidate for President," but remanded for further analysis on the signature requirement. *Id*.

Here, the number of votes for the Secretary of State in 2022 equaled 1,847,179. Bonnet Aff. ¶ 22. Two percent of the total is 36,944. *Id*. So, the signature requirement is a less than 50,000 signatures to be collected over several months and should not be impossible. *See Storer*, 415 U.S. at 740. Like the Court held in *Storer*, the gathering

16

of the required signatures could be performed in the nearly six months permitted under the Challenged Provisions, provided a party or a candidate has the support. *Id.*

The 2% requirement also advances compelling state interests—namely, the State's interest, as discussed above, in preserving State resources for candidates and parties that have public support, and in making sure that those parties likely to engage the majority of voters do so in a way that encourages public trust, is compliant with various Indiana campaign finance laws, and allows for the broadest possible scope of public participation. Bonnet Aff. ¶ 17. By limiting primaries to only some parties and requiring parties to illustrate a modicum of public support before having their name printed on the ballot, the State ensures those goals are met, while still allowing parties with a true groundswell of support a way onto the ballot, and allowing those without a sufficient level of support to still run as a write-in candidate. No person or party is prevented from voting for their candidate, and no candidate is prevented from running. The restriction is only on the candidate's ability to have their name pre-printed on the ballot; the State's imposition of the Challenged Provisions does not prevent Plaintiffs, or anyone else, from voting or from associating with their political party of choice. It follows that there is no constitutional violation here.

> b) *Indiana's Filing Deadline is not overly burdensome, and is justified by compelling state interests*

The deadline for completing the nomination petition process does not create an unconstitutional burden, as it provides ample time to comply with the requirements of the Challenged Provisions, and because it is necessary to allow the State to fulfill other obligations to voters and helps the State ensure the success of the election.

First, it must be noted that States have an inherent interest in requiring an early filing deadline. Bonnet Aff ¶ 19-20. Although most voters seem to gather the majority of their electoral information in the month prior to the election, *Dunn v. Blumstein*, 405 U.S. 330, 358 (1972), candidates waiting until a month before the election to submit the necessary paperwork justifying their printing on the ballot would not permit the State the time necessary to fulfill its other obligations to the citizens. Bonnet Aff. ¶ 19. Organization of a statewide or national election is a rigorous process that requires careful planning. *Id.* Indiana has 92 counties, each of which is individually responsible for organizing and running its election. Bonnet Aff. ¶ 23. This means that there are, on election day, over a thousand unique ballot types placed in use across the State. Bonnet Aff. ¶ 24. These counties, and the State-level entities who help coordinate elections, need time to: confirm who will appear on the ballot; ensure their information is correct; prepare, print, and distribute ballots; and prepare them for election day. Bonnet Aff. ¶ 25. All of this work must be done for each of the individual unique ballot types used across all 92 Indiana counties. Less than a month, or only a month, is a short span of time for work on such a scale to be done. In light of all of these concerns and logistical pressures, the filing deadline of June 30 of the election year—roughly four months before the election—is narrowly tailored, compelling, and justified.

It is true that deadlines that are unnecessarily early, such as one falling in February, have been declared unconstitutional. *Williams v. Rhodes*, 393 U.S. 23, 30 (1968). But June deadlines are not "unnecessarily early." The Court in *Jenness* found

that the second Wednesday in June, when paired with a stricter Signature Requirement than Indiana's, to be constitutional, 403 U.S. at 433-34, which represents an even shorter timeline than that challenged here.

In sum, requiring a Filing Deadline roughly four months before the election ensures that Indiana has adequate time to organize its electoral proceedings. Bonnet Aff. ¶ 20. Therefore, the Filing Deadline of June 30 is less restrictive than others, narrowly tailored to achieve compelling State interests, does not increase any inherent burden, and does not represent a constitutional violation.

### c) *The Petitioning Procedure does not impose unconstitutional burdens*

Indiana's Petitioning Procedure does not unconstitutionally restrict Plaintiffs from voting or freely associating with their political parties of choice. Plaintiffs claim the Petitioning Procedure is "grossly inadequate," at least in part, because it has been the procedure since 1889, that it is overly burdensome to them because their own procedures preclude rapid verification and certification of the information provided, and that the collection of the signatures is time-consuming and expensive. Pl.'s Memo at 21-22. None of these statements support Plaintiffs' claim that the Challenged Provisions are unconstitutional.

In 1889, when the petitioning procedure was implemented, if petitioners needed to gather signatures, they had to hop on a horse and ride to statewide locations, as cars were not widely popularized until well into the 1900s.[2] Even then,

---

[2] The Model-T, one of the first mass produced vehicles aimed at providing an affordable car, was not introduced until 1908. *The Model T*, FORD, https://corporate.ford.com/articles/history/the-model-t.html#:~:text=The%20Model%20T%20was%20introduced,of%20manufacturing%20the%20universal%20car (last

Indiana had ninety-two counties, making the geographic dispersal and county submission requirements the same as today.[3] Over the course of the last 130 years, politicians have used the Petitioning Procedure to qualify for ballot access in both state and local elections across Indiana. Bonnet Aff. ¶ 26.

Plaintiffs contend they must exceed the Signature Requirement by more than 50% because signors provide incorrect information, omit information, sign on the wrong line, provide the wrong address, and that their handwriting is illegible. Pl.'s Memo at 21. Plaintiffs even seem to allege that because they believe the process is being sabotaged by bad actors, Pl.'s Memo at 22, the State should be required to change the requirement. It is not the State's responsibility to collect that information, assure the signors correctly fill out the petition, or ensure against bad actors.

Finally, Plaintiffs contend that collecting signatures is time-consuming and expensive. Nevertheless, the Supreme Court in *Storer* did not find it impossible for a political party to collect over 300,000 signatures in just a twenty-four-day window. 415 U.S. at 740. Here, in 2024, candidates for statewide office will need to collect 2% of the 1,847,179 votes cast for Secretary of State in the 2022 election, or 36, 944 signatures. *See* Bonnet Aff. ¶ 22. If accepted as true, as Plaintiffs argue, *see* Pl.'s Memo at 21, that parties have to collect more than 50% extra signatures due to faulty information being provided, currently a candidate seeking ballot access would need to collect approximately 55,000 signatures to have a successful petition nomination.

---

visited May 21, 2023). *See, also*, *Automobile History*, HISTORY,
https://www.history.com/topics/inventions/automobiles (last visited May 21, 2023).
[3] "Indiana has ninety-two counties formed from 1790 to 1860." *Introducing Indiana*, THE INDIANA HISTORIAN, https://www.in.gov/history/files/introindiana.pdf (last visited May 21, 2023).

Still, the collection of less than 60,000 signatures is not a severe burden to a party if it has a substantial modicum of support. *See Storer*, 415 U.S. at 740.

The burden here, if any, is justified for all of the reasons discussed above—the State's interest in preservation of resources, in the continued preservation of public trust in the security and accuracy of elections, the reduction of voter confusion and joke candidates, and the focus on getting the most public participation possible in the electoral process. Bonnet Aff. ¶ 17. With these interests clearly tailored to the issues they address, there is no Constitutional violation here.

### d) The Vote Test does not make ballot access impossible

Indiana's Secretary of State is not up for election during the same election cycle as the President. Plaintiffs argue that Indiana's Vote Test makes it "impossible, under Indiana law, to form a new political party and retain ballot access in presidential election years." Pl.'s Memo at 23. While it is true that Indiana's Vote Test does provide a less-restrictive avenue for ballot access to those parties who can garner enough support to maintain 2% of the votes in the Indiana Secretary of State election, *see* I.C. § 3-8-4-1, it does not preclude other parties from gaining ballot access through the nomination petition process. *See supra*.

There is not an inherent right to be placed on the ballot for new political parties, and rarely will a party spring up overnight and have adequate support to launch a presidential campaign. In the case that does happen, they are still able to use the nomination petition process. Further, while they cannot retain ballot access in a presidential election year, any party can do so in the off-election schedule in

21

preparation for the presidential election year. If successful, thereafter, they would only need to maintain that 2% of the vote requirement.

Further, by tying the signature requirement to the Secretary of State election, the Challenged Provisions actually *lower* the bar for succeeding in the nomination petition procedure. As Plaintiffs note in their brief, *see* Pl.'s Memo at 23 (describing the election for Secretary of State as "a race for a largely administrative office that garners little attention among the electorate"), turnout for the election for Secretary of State is typically lower than that in a general election year, and is typically of less interest to the voting public than general elections for other offices. Bonnet Aff. ¶ 27. It follows then, that 2% of that lower number results in fewer signatures to gather overall than would be required if the higher-turnout presidential election figure was used as the basis for the calculation.[4]

The lower profile and lower turnout of the election for Secretary of State, in addition to creating lower numbers of signatures for parties and candidates to reach, also makes it an excellent candidate for measuring actual support for a political party. If an individual feels compelled to come out and vote in a lower-profile election, for a "largely administrative" office, there is probably an underlying interest in the party, not just in that specific candidate. It is this feature that makes the election ideal for determining the level of support held by a party, and thus their suitability for general ballot access.

---

[4] For example, the 2020 General Election, a presidential election year, had a voter turnout of 3,068,625. 2% of this requirement would be 61,372, a much higher number than the 36,944 that is required currently.

*e)  The Challenged Provisions Do Not Create Unequal Burdens*

The Challenged Provisions do not impose unequal burdens that violate the Equal Protection Clause. Plaintiffs argue that because Indiana's Major Parties[5] do not have satisfy the petitioning procedure requirements or the Vote Test, the Challenged Provisions impose unequal burdens on non-Major Party candidates and voters. Plaintiffs seem to contend that, but for the Challenged Provisions, they would be able to mount an effective presidential campaign. However, the scheme created by the Challenged provisions does not create unequal burdens for insupportable reasons: the State has legitimate, compelling interests justifying the Challenged Provisions, and has create a scheme that treats different groups differently due to those reasons.

In *Jenness*, the Supreme Court held Georgia's ballot access system recognized the "potential fluidity of American political life." *Jenness*, 403 U.S. at 439. There, Georgia law required a candidate who did "not enter and win a political party's primary election" and still wanted to have their name printed on the ballot, would have to "file[ ] a nominating petition signed by at least 5% of the number of registered voters at the last general election for the office in question." *Id*. at 432. Plaintiffs there argued that nonparty candidates were not receiving equal protection of the laws. *Id*. at 435. As the claims were based on the Supreme Court's decision in *Williams v. Rhodes*, 393 U.S. 23 (1968), the Court reviewed that holding in depth.

---

[5] Defined by Plaintiffs as any party required to hold a primary election but by statute as "either of the two (2) parties whose nominees received the highest and second highest number of votes statewide for secretary of state in the last election." Ind. Code § 3-5-2-30(1).

*In Williams*, the Court held Ohio's scheme to be unconstitutional where it required electors to obtain signatures from 15% of the number of ballots cast in the last gubernatorial election. 292 U.S. at 24-25. Further, Ohio had other statutes in place that included a February deadline for the petitions. *Id*. at 26-27. Such restrictions were held to be unconstitutional.

Nevertheless, in *Jenness*, the Court reviewed Georgia's statutory requirements for ballot access and held that they were "vastly different" from Ohio's. *Jenness*, 403 U.S. at 438. Similar to Indiana, Georgia allowed for write-in candidates, recognized independent candidates, did not fix an "unreasonably early filing deadline," did not "freeze the political status quo," and thus did not violate the Constitution. *Id*. The Court held that any political organization, regardless of size, was able to endorse its eligible candidate for any elective public office, under Georgia's laws. Like in Indiana, independent candidates and members of any political organization were free to associate and speak. *Id*. Further, such voters may write in their candidate's name or "seek, over a six months' period, the signatures of 5% of the eligible electorate for the office in question." *Id*. The Court held Georgia's statutes on this question "implicitly recognize[d]" that any political body may gain enough support to "become[] a 'political party' with its attendant ballot position rights and primary election obligations, and any 'political party' whose support at the polls falls below that figure reverts to the status of a 'political body' with its attendant nominating petition responsibilities and freedom from primary election duties." *Id*. at 439-440. The same is true here. Plaintiffs are given a choice to either request their voters write in the name of their

24

candidate or to pursue the 2% Signature Requirement and have the name(s) of their candidate(s) printed on the ballot. *See* I.C. § 3-8 *et seq.* Viewed as a whole, the Challenged Provisions provide the same protection to all parties, while taking into account the differing rights and obligations owed by the parties, candidates, and the State depending on the level of support shown by the electorate for the party or candidate.

The Challenged Provisions apply to all parties involved in the election process. If a Major Party were to fall out of favor and lose its privileges, it would still have to comply with the nomination petition process and other requirements in order to regain ballot access. The statutes create categories, it is true, but place no barriers on entrance into, or departure from, those categories. The power lies in the hands of the electorate to express their preference for parties by voting, participating in nomination petition drives, and otherwise expressing their support for their favored candidates. Put another way—there is nothing in Indiana law that cements the current status quo at any time, and existing political lines could blur or shatter with a persuasive enough party ideology.

Even without a name on the ballot, the Plaintiffs may still run for whatever office they please using the write-in ballot option. Indiana's election laws do not prevent them from associating within their political party, expressing their viewpoints, or even winning the election. Consequently, the Challenged Provisions do not violate Plaintiffs' constitutional rights.

*f)* *The Challenged Provisions Do Not Preclude Plaintiffs' Ability to Participate in Indiana's Electoral Process*

The Indiana Green Party and the Libertarian Party of Indiana have moderately distinct complaints, but the core of their arguments is the same—they are being denied the ability to participate in Indiana's electoral process. Pl.'s Memo at 25. At the national level, the Green Party was established "in the mid-1990s." *See* https://www.gp.org/early_history (last visited June 11, 2023). The Libertarian Party was founded in 1971. *See* https://www.lp.org/about/ (last visited June 11, 2023). Both parties are relatively new but still have had between 30 and 50 years to gather support and grow as parties.

Both parties contend that they do not have sufficient funds to mount a nomination petition campaign. Pl.'s Memo at 25-26. But these struggles seem to be based more in the level of support garnered by the parties, not the requirements of the Challenged Provisions. These concerns about levels of public support are not relevant to the issues raised by Plaintiffs regarding the constitutionality of the Challenged Provisions, and they should be properly ignored in this Court's evaluation of the Challenged Provisions.

Nothing in Indiana's electoral scheme prevents Plaintiffs from running for office, casting their vote, or even qualifying for ballot access. Indiana has established a minimally regulated electoral process in order to protect voters and prevent any confusion at the polls. These regulations do not impede Plaintiffs' participation in

Indiana's electoral process and cannot be seen as magnifying the burden to a severe level.

2. <u>Indiana is Not Required to Enact Hypothetical Less Burdensome Alternatives</u>

The State is not required to enact a less burdensome alternative where the current alternative is constitutional, provided the regulation does not impose a severe burden. *Acevedo v. Cook Cnty. Officers Electoral Bd.*, 925 F.3d 944, 949 (7th Cir. 2019). When two alternatives are presented, it does not mean the state "violated the Equal Protection Clause of the Fourteenth Amendment by making available [ ] alternative paths." *Jenness*, 403 U.S. at 440-41. No path "can be assumed to be inherently more burdensome than the other." *Id.*

Indiana offers candidates such a choice. They have the option of choosing a Major Party as their chosen political organization and using those resources, or mustering support for a different political party and eventually achieving renewed ballot access each election cycle. Ballot access is not an inherent right, it is something that must be earned through hard work and persuading voters to share in the cause.

Plaintiffs contend that Indiana could lower the Signature Requirement, have a later Filing Deadline, and update the Petitioning Procedure. However, Indiana's regulatory scheme functions as a machine, and changing its parts could drastically impact the State's legitimate state interests. While there may be less restrictive procedures available on this particular part of the legislative scheme, one must consider the effect on the whole scheme. Further, as the Challenged Provisions do not severely burden anyone's rights, *see supra*, the hypothetical alternatives proposed by

27

Plaintiffs are not required to be considered. Even if the Challenged Provisions were considered by this Court to severely burden the rights of Plaintiffs, as shown above, the State has provided a compelling interest that is protected by the Challenged Provisions that were narrowly tailored to achieve those interests. *See* Bonnet Aff. ¶ 17.

## CONCLUSION

The Challenged Provisions were enacted pursuant to compelling state interests that are not severely burdensome. Plaintiffs' claims of unconstitutionality are unfounded and not supported by evidence. Therefore, the Secretary respectfully requests the Court deny Plaintiffs' Motion for Summary Judgment, grant summary judgment in the Secretary's favor, and for all other relief deemed just and proper.

Respectfully submitted,

Date: <u>June 19, 2023</u>

THEODORE E. ROKITA
Attorney General of Indiana
Atty. No. 18857-49

By:    */s/ Kari A. Morrigan*
Kari A. Morrigan
Deputy Attorney General
Attorney No. 34706-49

By:    */s/ Lydia Golten*
Lydia Golten
Deputy Attorney General
Attorney No. 36440-49

OFFICE OF INDIANA ATTORNEY GENERAL TODD ROKITA
Indiana Government Center South, 5th Floor
302 West Washington Street
Indianapolis, IN 46204-2770
Telephone: (317) 233-8296 (Morrigan)
              (317) 233-0926 (Golten)
Facsimile: (317) 232-7979
E-mail: Kari.morrigan@atg.in.gov
          Lydia.golten@atg.in.gov