UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| INDIANA GREEN PARTY, | ) |
| LIBERTARIAN PARTY OF INDIANA, | ) |
| JOHN SHEARER, | ) |
| GEORGE WOLFE, | ) |
| DAVID WETTERER, | ) |
| A.B. BRAND, | ) |
| EVAN MCMAHON, | ) |
| MARK RUTHERFORD, | ) |
| ANDREW HORNING, | ) |
| KEN TUCKER, | ) |
| ADAM MUEHLHAUSEN, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) No. 1:22-cv-00518-JRS-KMB |
| | ) |
| DIEGO MORALES, in his official capacity | ) |
| as Indiana Secretary of State, | ) |
| | ) |
| Defendant. | ) |

**Order on Motion for Summary Judgment**

### I.  Introduction

This is a ballot access case.  In Indiana, minor political parties and independent candidates for public office must meet various statutory requirements before being listed on the ballot in state elections.  Plaintiffs—the Indiana Green Party, the Libertarian Party of Indiana, various of their officers, and some independent candidates for public office—together bring suit alleging that those requirements as applied violate their First and Fourteenth Amendment rights.

Now before the Court is Plaintiffs' Motion for Summary Judgment.  (ECF No. 60).

## II. Legal Standard

The legal standard on summary judgment is well established:

> Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Skiba* [*v. Illinois Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018)] (quoting *Anderson v. Liberty Lobby*, Inc., 477 U.S. 242, 248 [] (1986)). A theory "too divorced from the factual record" does not create a genuine issue of material fact. *Id.* at 721. "Although we construe all facts and make all reasonable inferences in the nonmoving party's favor, the moving party may succeed by showing an absence of evidence to support the non-moving party's claims." *Tyburski v. City of Chicago*, 964 F.3d 590, 597 (7th Cir. 2020).

*Marnocha v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 986 F.3d 711, 718 (7th Cir. 2021).  The Court applies that standard here.

## III. Discussion

### A. Ballot-Access Law

Ballot access cases are serious.

> Restrictions on access to the ballot burden two distinct and fundamental rights, "the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively."

*Illinois State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979) (quoting *Williams v. Rhodes*, 393 U.S. 23, 30 (1968)).  Ordinarily, burdens on fundamental rights are strictly scrutinized, *see, e.g.*, *Harper v. Virginia State Bd. of Elections*, 383 U.S. 663, 670 (1966) (holding poll tax unconstitutional), and, indeed, the Supreme Court once applied strict scrutiny to evaluate burdens on ballot access, *see Storer v. Brown*, 415 U.S. 724, 729 (1974) (citing as examples *Dunn v. Blumstein*, 405 U.S. 330 (1972); *Bullock v. Carter*, 405 U.S. 134 (1972); *Kramer v. Union Free*

2

*School District*, 395 U.S. 621 (1969)), *Munro v. Socialist Workers Party*, 479 U.S. 189, 201 (1986) (Marshall, J., dissenting) (observing that strict scrutiny was the "clear" standard in prior ballot access cases). The Court has gradually moved away from strict scrutiny of ballot access restrictions. *See Hall v. Simcox*, 766 F.2d 1171, 1173 (7th Cir. 1985) (analyzing the trend and noting "uncertainty about the standard"). In *Jenness v. Fortson*, 403 U.S. 431, 442 (1971), for example, the Court upheld a Georgia law requiring prospective independent candidates to have a nominating petition signed by 5% of the electorate in order to be listed on the ballot. The Court did not explain its standard of review; instead it observed that "[t]here is surely an important state interest in requiring some preliminary showing of a significant modicum of support before printing the name of a political organization's candidate on the ballot—the interest, if no other, in avoiding confusion, deception, and even frustration of the democratic process at the general election." *Id.* at 442. Later cases picked up that observation, *Storer*, 415 U.S. at 732, and expanded it, adding, for instance, that "splintered parties and unrestrained factionalism may do significant damage to the fabric of government. . . . [T]he State's interest in the stability of its political system . . . [is] compelling," *id.* at 736.[1] *See also Anderson v. Celebrezze*, 460 U.S. 780, 788

---

[1] The Supreme Court has often justified ballot access restrictions by appeal to the purported stability of the two-party system. *See, e.g.*, *Storer*, 415 U.S. at 736 ("California apparently believes with the Founding Fathers that splintered parties and unrestrained factionalism may do significant damage to the fabric of government."); *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 367 (1997) ("[T]he States' interest permits them to enact reasonable election regulations that may, in practice, favor the traditional two-party system . . . and that temper the destabilizing effects of party-splintering and excessive factionalism."). But those references may be misplaced.

In The Federalist 10, which is almost invariably cited in judicial discussions of factionalism, *see, e.g.*, *Storer*, 415 U.S. at 736, *Norman*, 502 U.S. at 299–300 (Scalia, J., dissenting),

3

n.9 (1983) (citing *Jenness* for the proposition that the state has "the undoubted right to require candidates to make a preliminary showing of substantial support in order to qualify for a place on the ballot"). The current test reflects that historical trend

---

*Timmons*, 520 U.S. at 368, *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 143 S. Ct. 2141, 2201 (2023) (Thomas, J., dissenting), Madison warns against the danger of having any one faction in the majority. The Federalist No. 10 (James Madison). He argues that a large, federated republic will be less subject to a tyrannous majority because it will encompass more competing interests, and no one faction will take control. Laws will be better and more impartially considered when passage requires many different interests to concur. In other words, Madison's concern with "factionalism" in The Federalist No. 10 is *exactly the opposite* of the concern about "party-splintering" advanced in *Storer* and cases citing to it. Nor is The Federalist No. 10 unique in its views. The same theme recurs later, in The Federalist No. 51 (James Madison) ("There are but two methods of providing against [the evil of an unjust majority] . . . by comprehending in the society so many separate descriptions of citizens as will render an unjust combination of a majority of the whole very improbable, if not impracticable"), and in George Washington's Farewell Address, where he warned: "[t]he alternate domination of one faction over another, sharpened by the spirit of revenge natural to party dissension, which in different ages and countries has perpetrated the most horrid enormities, is [] a frightful despotism." The Founders, viewing factions as inevitable, wanted at least for there to be many of them, so that organizing a majority would be difficult.

This Court suspects, then, that the Founders would not have countenanced *any* of the various devices by which the modern state assumes responsibility for party organization (with publiclyfunded primary elections), enforces party discipline (with sore-loser laws), or deters independent and third-party candidacies (with the ballot access rules of the sort at issue here). Those devices, of course, have been variously upheld. *See, e.g.*, *Tashjian v. Republican Party of Connecticut*, 479 U.S. 208, 212 (1986) (implicit support for publiclyfunded primaries); *Storer*, 415 U.S. at 736 (sore-loser laws); *Burdick v. Takushi*, 504 U.S. 428, 439 (1992) (write-in ban); *Timmons*, 520 U.S. 351, 354 (1997) (ban on "fusion" candidates).

It bears remembering that for the first hundred years of the nation's history, all ballots were write-in ballots, the voter had unrestricted choice of candidates, and the state exercised no control over party organization. *Burdick*, 504 U.S. at 446 (Kennedy, J., dissenting). The "Australian ballot," introduced as a reform in the late nineteenth century, brought both secret ballots and state control over the names listed on the ballot. (One could, of course, have had one change without the other, but that is not how it happened.) Critics at the time argued that state control over the list of candidates on the ballot impinged on the voters' freedom of choice. Eldon Cobb Evans, Dissertation, *A History of the Australian Ballot System in the United States* at 24–25 (1917); Robert La Follette, *The Adoption of the Australian Ballot in Indiana*, 24 No. 2 Ind. Mag. History 105, 119 (1928). The response? It was (then) so easy to get on the ballot that the restrictions were trivial. It is now perhaps hard to imagine a voting system without two parties wielding state power to entrench their advantages, but a long-historical view reveals there are alternatives.

4

toward excusing state burdens on ballot access[2]; now, under the so-called *Anderson-Burdick* test, the standard is not strict scrutiny but true balancing. The test directs this Court

> first [to] consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests, it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights. Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional.

*Gill v. Scholz*, 962 F.3d 360, 364 (7th Cir. 2020) (quoting *Anderson*, 460 U.S. at 789 (1983)). While in principle "the balancing test requires careful analysis of the facts," so it "should 'not be automatic,'" *id.* at 364–65 (quoting *Anderson*, 460 U.S. at 789), the test does not "require elaborate, empirical verification of the weightiness of the State's asserted justifications." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 364 (1997) (citing *Munro*, 479 U.S. at 195–196), *see also Tripp v. Scholz*, 872 F.3d 857, 866 (7th Cir. 2017) (the state needs no "particularized showing" of voter confusion, ballot "overcrowding," or the like to rely on those asserted interests). And, in practice, courts have not conducted an independent balancing when faced with

---

[2] The move away from strict scrutiny has its dissenters. *See, e.g.*, *Timmons*, 520 U.S. at 378 (Stevens, J, dissenting) ("In most States, perhaps in all, there are two and only two major political parties. It is not surprising, therefore, that most States have enacted election laws that impose burdens on the development and growth of third parties. . . . The fact that the law was both intended to disadvantage minor parties and has had that effect is a matter that should weigh against, rather than in favor of, its constitutionality."); *Munro*, 479 U.S. at 201 (Marshall, J., dissenting) ("The necessity for [strict scrutiny] becomes evident when we consider that major parties, which by definition are ordinarily in control of legislative institutions, may seek to perpetuate themselves at the expense of developing minor parties.").

laws that are within the bounds set by earlier cases. *Norman v. Reed*, 502 U.S. 279, 295 (1992) (upholding, post-*Anderson*, a 2% nominating petition requirement as "considerably more lenient" than the 5% upheld in *Jenness*); *Hall*, 766 F.2d at 1174–75 ("We must follow what the Supreme Court does, and not just what it says . . . and while as an original matter a 2 percent requirement . . . might be thought an undue restriction on minor parties' access to the ballot, . . . the lawfulness of such a restriction follows *a fortiori* from the decisions upholding higher requirements."); *Libertarian Party of Illinois v. Rednour*, 108 F.3d 768, 776 (7th Cir. 1997) (citing *Norman* and *Jenness* to uphold "nearly identical" 5% petition requirement).

B. Case at Bar

The facts here are undisputed. In Indiana, ballot access is indexed to the latest Secretary of State election. Parties whose candidate receives 10% or more of the vote in that election must nominate candidates by primary elections, which are publicly funded. Ind. Code §§ 3-10-1-2, 3-11-6-1. Parties whose candidate receives between 2% and 10% of the vote nominate their candidates by party convention. Ind. Code § 3-10-2-15. All those parties above 2% retain ballot access automatically. Ind. Code § 3-8-4-1. Everybody else—parties whose candidate receives less than 2% of the vote, new parties, and all independents, regardless of how they performed in the previous election—must qualify for ballot access by petition. That requires getting hand-signed petitions amounting to 2% of the vote total from the previous Secretary of State election (about 40,000 in recent years), Ind. Code § 3-8-6-3, and submitting those petitions, divided up by county of voter registration, to each of 92 county

6

election boards, Ind. Code § 3-8-6-6, by June 30 of the election year, Ind. Code § 3-8-6-10(b).

While the parties dispute the burden imposed by those ballot access laws, they agree on the historical results. No independent or third-party candidate has successfully petitioned for ballot access since Pat Buchanan in 2000. (Pl.'s "Material Facts Not in Dispute" 5, ECF No. 61.) (Ralph Nader attempted a nomination petition the same year and failed. (*Id.*)) The Libertarian Party has retained ballot access by winning 2% or better of the vote in the Secretary of State elections. The party claims it must devote undue attention to those non-presidential-year races because it is convinced that it could not regain ballot access by nomination petition were it to fall off the ballot. (McMahon Decl. 3–8, ECF No. 60-7.) Current estimates reflect that a nomination petition would cost something like $500,000 and require gathering some 60,000 signatures (allowing a 50% overage for those signatures later found invalid) to have a fair chance of succeeding. (Hawkins Decl. 1–2, ECF No. 60-5.) Other minor parties, including the Green Party, and various independent candidates, assessing those costs, have chosen not to attempt nomination petitions. (Material Facts 5–6, ECF No. 61.)

The State lists the "compelling state interests" its ballot access laws ostensibly serve. (Def.'s Resp. 7–8, ECF No. 65.) Those interests are, not surprisingly, the canonical interests—in avoiding voter confusion, ballot overcrowding, and the like, *see, e.g.*, *Jenness*, 403 U.S. at 442, *Storer*, 415 U.S. at 729, *Burdick*, 504 U.S. at 433—

7

that the state need merely assert to have count for it in the balance, *see Munro*, 479 U.S. at 194, *Tripp*, 872 F.3d at 866.

Plaintiffs argue that the 2% requirement, as exacerbated by the 92-county procedure, imposes a burden that outweighs the state interests asserted. The Court, were this an issue of first impression, might agree. *Cf. Hall*, 766 F.2d at 1174–75 ("[A]s an original matter a 2 percent requirement . . . might be thought an undue restriction on minor parties' access to the ballot if the test is 'the least drastic means.'"). The State—the body politic as it exists independently of the party-affiliated individuals who fill its offices—has no legitimate interest in shielding established parties from either outside competition or internal dissent. *Williams v. Rhodes*, 393 U.S. 23, 32 (1968) ("Competition in ideas and governmental policies is at the core of our electoral process and of the First Amendment freedoms").[3] But just like the court in *Hall*, and despite the more recent cases from the Seventh Circuit urging a careful balancing in each case, precedent compels this Court to conclude that the burden imposed is not unconstitutional. *Norman*, 502 U.S. at 295 (approving 2% requirement, post-*Anderson*, without conducting balancing, as within the acceptable bounds established by *Jenness*); *Rednour*, 108 F.3d at 776. The Seventh Circuit in *Hall* evaluated the same 2% requirement challenged here and came to the same conclusion. 766 F.2d at 1175 ("[T]he lawfulness of [the 2%] restriction follows *a*

---

[3] *Contra, e.g.*, *Storer*, 415 U.S. at 735, which upheld restrictions on independent candidacies because "[t]he general election ballot is reserved for major struggles; it is not a forum for continuing intraparty feuds." The only principled difference between an "intraparty feud" and a "major struggle" is whether the debating candidates claim the same party name; there have been—and are—policy debates within the two major parties that would, if those parties split, easily be considered "major struggle[s]" worthy of a general election.

8

*fortiori* from the decisions upholding higher requirements); *see also Tripp v. Scholz*, 872 F.3d 857, 865 (7th Cir. 2017) ("On multiple occasions, the Supreme Court has upheld signature requirements equaling 5% of the eligible voting base."). The Supreme Court has upheld higher nominating petition requirements, *Jenness*, 403 U.S. at 438 (upholding 5% requirement), *Storer*, 415 U.S. at 738 (same, and suggesting in dicta that "gathering 325,000 signatures in 24 days" is not impossible), *Norman*, 502 U.S. at 292 (approving requirement of "only" 25,000 signatures), and has dismissed minor additional procedural burdens, like notarization of petition signatures, as trivial, *Am. Party of Texas v. White*, 415 U.S. 767, 787 (1974), *see also Hall*, 766 F.2s at 1175 (bar on write-in option is "trivial" additional restriction). Indiana's filing deadline is likewise within established bounds: *Jenness* upheld a mid-June deadline, earlier than the June 30 deadline here. 403 U.S. at 433–34.

## IV. Conclusion

In conclusion, this Court does not see anything here to distinguish this case from precedent, which is "beyond [its] power to reexamine." *Hall*, 766 F.2d at 1173. For now, under the Supreme Court's lenient standard for state burdens on minor-party ballot access, a 2% petition requirement, even accompanied by tedious procedural burdens, is constitutionally permissible. Plaintiff's Motion for Summary Judgment, (ECF No. 60), is **denied**, and the State's Cross-Motion for Summary Judgment, (ECF No. 64), is **granted**.

Final judgment shall issue separately.

9

**SO ORDERED.**

Date: 08/14/2023

_____
JAMES R. SWEENEY II, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Mark R. Brown
Mark R. Brown
mbrown@law.capital.edu

Lydia Ann Golten
INDIANA ATTORNEY GENERAL
lydia.golten@atg.in.gov

Oliver B Hall
Center for Competitive Democracy
oliverhall@competitivedemocracy.org

Kari A. Morrigan
Office of Indiana Attorney General Todd Rokita
Kari.Morrigan@atg.in.gov

William Price Tedards, Jr.
William P. Tedards, Jr.
bt@tedards.net